Kenneth B. SIMMONS, Petitioner,

v.

Lynn BOMAR, Warden, Tennessee State Penitentiary, Nashville, Tennessee, Respondent.

Civ. A. No. 3600.

United States District Court
M. D. Tennessee,
Nashville Division.

March 12, 1964.

David W. McMackin, Nashville, Tenn., for petitioner.

Henry C. Foutch, Asst. Atty. Gen. of Tennessee, Nashville, Tenn., for respondent.

WILLIAM E. MILLER, Chief Judge.

Petitioner, a prisoner in the Tennessee State Penitentiary, has filed a petition for writ of habeas corpus in forma pauperis attacking the legality of his confinement. Petitioner contends that his conviction on several counts of burglary was based upon the introduction of evidence which had been obtained by the police through an unlawful search of his trailer home in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States. [Same case: Simmons v. State, 210 Tenn. 443, 360 S.W.2d 10 (1962); and Simmons v. Bomar, 224 F.Supp. 633 (M.D.Tenn.1964).]

Introduction of this contested evidence was seasonably objected to by petitioner's retained counsel in the original trial. In the absence of the jury the state trial court heard testimony and argument of counsel bearing on the admissibility of the evidence. A transcript of the proceedings has been filed and made a part of the record in this Court, and counsel for both petitioner and respondent have agreed that the transcript shall constitute the proof in this Court.

The facts, as they appear in the record as a whole, and particularly from the testimony of the arresting officer, Detective Morrison, are essentially as follows: Prior to petitioner's arrest there had occurred a large number of burglaries of business establishments in Davidson County, Tennessee. The police (Detective Morrison and others) had unconfirmed information that Simmons was involved in a number of these. (Transcript, page 145.) At 9:00 o'clock on the night prior to the arrest Morrison received information from two girls that stolen property was located in the trailer occupied by Simmons and one Sompayrac (admitted accomplice and chief state's witness). In addition to telling the location of the trailer and description of Simmons' cars (information not previously available to the police), the girls said that Simmons planned to leave town the following day. (Transcript, page 145.) Morrison stated that although he had not on any prior occasion received information from the two girls, he had in the past received information of this type from the parents of the girls and therefore believed the informants to be reliable. (Transcript, page 159.) This information was received by Morrison while off duty at his home in the country, and he did not return to town until the next morning for regular roll call at 8:00 A.M. As soon as possible thereafter, Morrison and his partner left for the trailer park where they were joined by two other officers. Morrison stated that a warrant was not obtained for the reason that he feared Simmons would be gone before he got there if he waited to get the warrant. (Transcript, page 162.) He also stated that he went out there to talk with Simmons about the burglaries and stolen property, and intended to search if it proved necessary, but only if Simmons gave his consent. (Transcript, page 160.) Upon arriving at the trailer park at approximately 9:00 to 9:30 A.M. and confirming the location of Simmons' trailer (rented in the name of "Stone", transcript, page 145), Morrison and the three other officers went to the door of the trailer. Simmons and Sompayrac were asleep inside. Morrison testified:

"I knocked on the door. Simmons came to the door. I said, 'Hi, Kenneth, how are you doing?' He stepped back, at that time he didn't recognize me, and said 'Come in'. I stepped up in the door and Mr. Noland stepped up, I mean Mr. Owen stepped up behind me. Somebody was laying in the bed. First I thought it was a girl in bed, I says, 'Who's your friend, Kenneth?' He told me something, I don't remember what he called him. I says, 'Kenneth, we've got information you've got a lot of stolen stuff in this house.' He says, 'I don't know any-

thing about it.' I says well, 'we've got information you got stolen radios, televisions and a bunch of narcotics and pistols here. You want us to get a warrant, or you want to let us search and look around or do you want part of us to go get a warrant and some of us stay here until they get back with the warrant?' He said, 'I don't know what you're hunting for, if you're going to do that, no reason for that, go ahead and look.' I had done seen the radio I had information on and the television setting up in the front end of the trailer. What they call the living room." (Transcript, page 146.)

Thereafter, Morrison and the other officers conducted a search of the trailer. Examination of Morrison by the District Attorney continued:

Q. "Now, after you found this property that you had been told was there, what else did you find in the trailer?

A. "Well, we seen all this other stuff and when we went to looking, found the gas mask and bunch of tools under a little cubbard (sic). Kenneth commenced winding around in there.

Q. "What kind of tools?

A. "Burglary tools. When he done that, that's when I put him under arrest. I said, 'Kenneth, we've done found what we're looking for. You are under arrest. Sit down over there." (Transcript, page 148.)

Concerning the initial entry into the trailer and the subsequent waiver or consent of Simmons to a search without a warrant, Detective Morrison testified:

Q. "Did you force, in any way, your way into the trailer?

A. "No, sir.

Q. "Did you tell him you'd go get a warrant if he preferred you to?

A. "That's right, if he requested us to get a warrant, we'd get a warrant, some of us were going to stay there on the trailer until the others went and got the warrant." (Transcript, page 147.)

It should also be noted that at the time of the arrest Simmons had a record of prior convictions for housebreaking. (See Answer filed by respondent and transcript, page 203.) Morrison had on prior occasions had similar dealings with Simmons, and therefore knew and recognized Simmons at the time of the arrest. (Transcript, page 145, " * * * I never seen Kenneth from the time I was in Court on him before until this time.")

■ For the search, seizure, and arrest here complained of, all without a warrant, to be constitutionally permissible and not in violation of petitioner's rights, it must appear that the original entry into the petitioner's trailer home was lawful and that the subsequent search of the trailer by the police officers was consented to by the petitioner and that he thereby waived his constitutional rights. The State made no contention that this was a search incident to a lawful arrest.

■ In some instances it might be better practice for police officers to announce their authority and purpose before entering a dwelling. However, under the circumstances disclosed by the record it cannot be said that the conduct of these officers constituted an unlawful or unreasonable entry. They neither used nor threatened force or violence; they did not employ fraud, disguise, or deception. Consequently, that Morrison thought Simmons did not immediately recognize him, does not render the invitation of Simmons to "come in" any less effective in validating the subsequent entry. Nevertheless, it is clear that so far Simmons had not waived his right to require a search warrant, and had the police officers begun a search without further consent such action would have been unlawful and any evidence disclosed would have been inadmissible. Cf. United States v. Evans, 194 F.Supp. 90 (D.C. 1961).

There is no question that one's constitutional right to demand a search warrant can be waived or that one can consent to a search without a warrant. United States v. Jones, 204 F.2d 745 (7th Cir. 1953), cert. denied, 346 U.S. 854, 74 S.Ct. 67, 98 L.Ed. 368. However, this is not presumed, and the burden is upon the state to show that a competent and voluntary waiver has been made. Mere acquiescence or consent in the face of an announced or apparent intention to search with or without a warrant or permission does not constitute a waiver. See Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); Catalanotte v. United States, 208 F.2d 264 (6th Cir. 1953); Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649 (1951); United States v. Evans, supra.

However, where, as here, the consent is given in response to an announced intention to leave and secure a warrant if permission is not given, the waiver is competent and voluntary. Gatterdam, et al., v. United States, 5 F.2d 673 (6th Cir. 1925); United States v. Page, 302 F.2d 81 (9th Cir. 1962); Grice v. United States, 146 F.2d 849 (4th Cir. 1945); United States v. Haas, 106 F. Supp. 295 (W.D.Pa.1952); Frix v. State, 148 Tenn. 478, 256 S.W. 449 (1923).

Thus, having consented to the search without a warrant, the protection of the Fourth Amendment was lost to the petitioner. United States v. Smith, 308 F.2d 657 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716; McDonald v. United States, 307 F.2d 272 (10th Cir. 1962).

Finally, if in fact at the time permission was given to search without a warrant, the officers would not have been able to obtain a search warrant, then it might be argued that the waiver was based upon misrepresentation or mistake and was therefore invalid. However, the officer did not misrepresent the situation. He did in fact have information sufficient to obtain a search warrant, even without use of the information within his personal knowledge gained from what he observed upon entering the trailer. Even if his informants were unavailable to submit affidavits of their personal knowledge, the officer had good and sufficient cause to believe his informants and obtain a warrant on the basis of his belief in their reliability. It is not necessary in all instances that informants shall have been *proved* reliable. It is true that information from an unknown or unreliable informant is not sufficient probable cause for issuance of a warrant. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). However, the officer had no reason to doubt the veracity of these girls. They were, so far as he knew, reliable informants. The following test has been formulated by the Supreme Court:

"Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543." Brinegar v. United States, 338 U.S. 160, 175–176, 69 S. Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949).

Thus, upon this hearsay evidence (and his personal knowledge of Simmons' past record of similar criminal activity) the officer could have executed an affidavit sufficient to support the issuance of a warrant. United States v. Eisner, 297 F.2d 595 (6th Cir. 1962).

From the foregoing it can be seen that petitioner's claim of violations of his constitutional rights has not been substantiated, and that the evidence obtained by the police officers in searching his trailer home was properly admitted by the trial court.

Accordingly, it is ordered that the petition for writ of habeas corpus in forma pauperis filed by the petitioner be, and the same is hereby denied.