Argued July 8, affirmed September 22, 1971

# STATE OF OREGON, *Respondent, v.* GARY LeROY DOUGLAS, *Petitioner.*

488 P2d 1366

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed briefs for petitioner.

*John W. Osburn,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

TONGUE, J.

Defendant was convicted of the crime of burglary after denial of a motion to suppress evidence upon the ground that defendant was coerced into opening his suitcase, which contained some of the stolen goods, by repeated representations of police

officers that otherwise they "would obtain a search warrant," all in violation of defendant's rights under the Fourth Amendment of the Constitution of the United States. Defendant's conviction was affirmed by the Court of Appeals, 5 Or App 175, 481 P2d 653 (1971). In view of the importance of the questions involved we granted defendant's petition for review of that decision.

Because decisions in cases involving alleged illegal searches and seizures depend largely upon the particular facts of each case, we shall review the testimony as given at the hearing on defendant's motion to suppress in more than usual detail.

At about 1:30 a.m. on the morning of February 15, 1970, the city marshal of Hines, Oregon, was informed that a Texaco station had been broken into and that a man with white pants and a blue or green coat had been seen running out. The officer went to investigate and saw a man answering that description run away. Hines is a small town in a rural area in Eastern Oregon in which it is not normal for strangers to be seen running about late at night.

After being unable to find the man, the officer called a state police officer, who came to the scene. While the two officers were conversing, defendant came out of a motel room across the street, went to an outside telephone booth and then approached the officers to inquire about bus service. At that time defendant was wearing dark pants and a sport shirt.

The officers asked defendant his name. He gave his name and also the name of a brother-in-law living in nearby Burns. He then returned to the motel. The officers called the police dispatcher in Burns by radio telephone to check whether defendant had such a

brother-in-law there. The Burns police called back with a negative answer.

The officers then went across the street to defendant's motel unit, knocked on the door and asked if they could come in. Defendant admitted that he "invited them in." They told him of the call to check with his brother-in-law and asked him for further identification. While defendant was going through his billfold to produce further identification the city marshal looked into an open closet and saw a coat like the one worn by the man he had seen earlier that night. It was wet and muddy and the ground outside on that night was wet and muddy.

According to defendant, the officers then told him about the burglary of the service station and asked if they could look in his suitcase; that he declined to give them permission to do so; that the state police officer then said, "Well, I can get a search warrant," and that he said "Go ahead and get it." At another point, he answered in the affirmative a question asking whether "the officer led you to believe if you didn't consent that they would get—would *try* to get a search warrant."

The state police officer testified, to the contrary, that he told defendant that he would *"make an effort to get* a search warrant." He also testified that defendant was not then under arrest and that he had no intent to arrest him at that time and no reason to "hold" him, although he was suspicious of defendant upon finding the muddy coat. Thus, he testified that if defendant had asked to go he would have been allowed to go, although the police would have followed him. At that time they did not know that anything had been taken from the service station.

The city marshal testified, however, that he told defendant that he would get a search warrant. At another point he testified that he told defendant that he was "going to *try* to get one." He also testified that although defendant was not arrested at that time they were "detaining" him and would not have let him leave, but had not so informed him. He testified, however, that although he was suspicious of defendant at that time, defendant was not yet a "focal suspect of this crime."

The officers did not inform defendant of any of his constitutional rights at that time. Defendant admitted, however, that he knew at that time that he had "the right to deny them to search [his] clothing or [his] belongings without a warrant" and "that was the reason [he] told them that night they couldn't search."[1]

After "about 10 minutes," according to defendant, his brother-in-law arrived, apparently as a result of a telephone call from the Burns police. Defendant testified that while defendant's brother-in-law was "outside," apparently talking with the state police officer, he was alone with the marshal, who told him that "it would be better all the way round if I opened it myself because they could get a search warrant"; that "it was coming out" and "would be out there in just a matter of minutes." His brother-in-law then came in and talked alone with defendant. The brother-in-law testified that he also told defendant that "they had a search warrant. It was on its way, that it would be searched anyway." Defendant also testified that "when my brother-in-law made the statement, too, I could see no reason to—so I assumed they did have it, so why

---

[1] It also appears that defendant was an ex-convict and was well aware of his constitutional rights.

not open it anyway." Defendant's brother-in-law then "went out" and the marshal "came in" again. Defendant then picked up the suitcase and dumped out the contents.[2]

Both the marshal and defendant's brother-in-law denied telling defendant that the officers had a search warrant "on its way." Defendant's brother-in-law also testified that "they were in the process of trying to get a search warrant" and that he "tried to convince him to open it and to save any embarrassment and any requirement of a search warrant," but that defendant said "it was none of their business. It was invading his private business and they didn't need any."

When defendant's brother-in-law and the state police officer came back defendant's clothes were back in the suitcase, but by then the marshal had told the state police officer that defendant had previously dumped out the contents of the suitcase. The state police officer then asked defendant if he could look at the contents and defendant again dumped out its contents.

The state police officer then checked the contents and found a roll of green stamps, but no white pants. At that time the officers did not know that green stamps had been stolen. The marshal then said that there were "a lot more" green stamps when the suitcase was previously opened. Several more rolls were then found in the sink in the bathroom. The white pants were also found hidden in a blanket on a closet shelf.

---

[2] This version of the incident, as testified by defendant, is somewhat different from that of the city marshal, who testified that while he was alone with defendant he told defendant that "we didn't care whether he opened it or not because he *was* going to get a search warrant" and that "he just finally opened one end and dumped it on the floor of the motel."

At that point the owner of the service station arrived and it was discovered not only that green stamps had been taken from the station, but that the serial numbers of the missing green stamps matched those found in defendant's motel room. The total value of the green stamps was approximately $330.

Defendant was then arrested and informed of his constitutional rights. The elapsed time between the time when the officers called at the motel and the time when defendant opened his suitcase was "probably a half hour," according to defendant.

Three days later, on February 18, 1970, defendant appeared with appointed counsel to be arraigned and pleaded not guilty to a charge of burglary not in a dwelling. The case was then set for trial on March 10, 1970. On March 3, 1970, defendant filed a motion for an order to suppress as evidence "the contents of a suitcase" upon the ground that "no search warrant was issued and said suitcase was only opened through coercion and duress" by the police officers. The motion was supported by a short affidavit alleging that the officers "repeatedly told me that they would obtain a search warrant for the suitcase" if he refused to open it; that he believed these representations and otherwise would not have consented to an examination of the contents of the suitcase.

A hearing was held on the motion to suppress, at which the officers and other witnesses, as well as defendant, testified to the facts as already stated. Based upon that testimony, and after observing the demeanor of the witnesses, the trial judge found at the conclusion of the trial that "the defendant was not coerced in any way to open the suitcase"; that defendant also was not told a warrant was on its way, but

was told that if he didn't open the suitcase the officers "would *attempt to get* a warrant"; that at the time "defendant was not a focal suspect" and "was not in custody," but that there was "suspicion only."

In beginning a discussion of the law applicable to the facts of this case it is perhaps an understatement to say that the subject of illegal searches and seizures is one of the most confused and difficult subjects of the law today.

■ We start, of course, with the recognition that the Fourth Amendment of the Constitution of the United States does not prohibit *all* searches and seizures, but only *"unreasonable* searches and seizures." It follows that "standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application."[3] It also follows that the determination of whether a search and seizure is "unreasonable" involves a balancing of the fundamental right of privacy of an individual against the needs of the state.[4]

The Supreme Court of the United States has held that searches and seizures conducted without search warrants "are *per se* unreasonable," subject to "a few specifically established and well-delineated exceptions," and that the application of these exceptions is dependent upon the presence of "exigent circum-

---

[3] Ker v. California, 374 US 23, 33, 83 S Ct 1623, 10 L Ed 2d 726 (1963). See also Coolidge v. New Hampshire, 403 US 443, 483, 91 S Ct 2022, 29 L ed 2d 564 (1971), in which it is recognized, at 593, that:

"Of course, it would be nonsense to pretend that our decision today reduces Fourth Amendment law to complete order and harmony. The decisions of the Court over the years point in differing directions and differ in emphasis. * * *."

[4] Consent Searches: A Reappraisal after Miranda v. Arizona, 67 Colum L Rev 130, 148 (1967).

stances."⑤ One of these "exceptions" is that of so-called "consent searches."⑥

■ When, as in this case, the state relies upon a "consent search" as the basis for a search and seizure without a warrant, the question whether valid consent was given to the search is generally held to be a question of fact and the state has the burden to prove by "clear and convincing evidence" that such consent was given.⑦

This court, in *State v. Marshall*, 234 Or 183, 380 P2d 799 (1963), agreed with this view. We held, however (at pp 184-185), that in such a case the trial court

⑤ Coolidge v. New Hampshire, 403 US 443, 91 S Ct 2022, 29 L ed 2d 564, at 576, 588 and 590-592 (1971).

⑥ See Owens, Requirement of an Effective Consent to a Warrantless Search, 3 John Marshall J Prac & Proc 403, 404 (1970), and Note: Consent and the Constitution after Bumper v. North Carolina, 6 Calif W L Rev 316, 318 (1970).

⑦ See Wren v. United States, 352 F2d 617, 618-19 (10th Cir 1965). See also Channel v. United States, 285 F2d 217, 219-20 (9th Cir 1960); United States v. Blalock, 255 F Supp 268, 269 (ED Pa 1966).

Coolidge v. New Hampshire, 403 US 443, 91 S Ct 2022, 29 L ed 2d 564, 593-596 (1971) (in which part of the evidence in issue was produced voluntarily by defendant's wife), is consistent with this view. Indeed, the Court said, at p 595, in rejecting objections to that evidence:

"In a situation like the one before us there no doubt always exist forces pushing the spouse to cooperate with the police. Among these are the simple but often powerful convention of openness and honesty, the fear that secretive behavior will intensify suspicion, and uncertainty as to what course is most likely to be helpful to the absent spouse. But there is nothing constitutionally suspect in the existence, without more, of these incentives to full disclosure or active cooperation with the police. The exclusionary rules were fashioned 'to prevent, not to repair,' and their target is official misconduct, * * *. If, then, the exclusionary rule is properly applicable to the evidence taken from the Coolidge house on the night of February 2, it must be upon the basis that some type of unconstitutional police conduct occurred."

and jury is entitled to believe the officers and to disbelieve the defendant and that the question is then whether, if they believed the officers, the evidence would establish the giving of consent "in unequivocal language and without coercion or other conduct negativing real assent to the search."

Later, in *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), we affirmed findings by a trial court that admissions made to the police by petitioner were not "coerced" and held (at p 487) that if the evidence sustains such findings of fact they will not be disturbed by this court unless the facts upon which such findings are made are "insufficient to meet constitutional standards of due process."

■ Thus, the primary question to be decided in this case is whether the evidence was sufficient to sustain the findings of fact by the trial court and to satisfy the requirements as stated by this court in *State v. Marshall* and *Ball v. Gladden.*

This is a d i f f e r e n t question from that presented to this court in *State v. Williams,* 248 Or 85, 432 P2d 679 (1967). In that case defendant consented to a search after arrest and during interrogation at the police station. Under those circumstances, we held that the police had a duty to affirmatively inform defendant of his Fourth Amendment rights and stated (at p 93):

"* * * The principle announced in Escobedo v. Illinois, 378 US 478, 84 S Ct 1758, 12 LEd2d 977 (1964), as interpreted by us in *State v. Neely,* 239 Or 487, 395 P2d 557, 398 P2d 482 (1965), is applicable not only to interrogations leading up to confessions but is equally applicable to interrogation aimed at obtaining the defendant's consent to

search and seizure *when he is a focal suspect in the custody of the police.* In effect, the request to search is a request that defendant be a witness against himself which he is privileged to refuse under the Fifth Amendment. *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 LEd2d 694, 10 ALR3d 974 (1966), made it clear that pre-interrogation warning by the police was necessary to safeguard this Fifth Amendment privilege. * * * The Fifth Amendment privilege is recognized in these cases because its application was deemed necessary as a prophylaxis against coercive police practices. The same prophylaxis is necessary whether the interrogation is used to obtain a confession or to establish a suspect's guilt through his disclosure of evidence pointing to his guilt. * * *." (Emphasis added)

The thrust of *Miranda, Neely,* and *Williams* is that "custodial interrogation" of a defendant who has been arrested and is then being interrogated "contains inherently compelling pressures which work to undermine the individual's will to resist." See *Miranda v. Arizona,* 384 US 436 at 467, 86 S Ct 1602, 16 L ed 2d 694 (1966). See also *State v. Taylor,* 249 Or 268, 271, 437 P2d 853 (1968), and *State v. Cook,* 242 Or 509, 514, 411 P2d 78 (1966). Because of the "inherently compelling pressures" in "custodial interrogation" of an arrested person, and as a "prophylactic measure" to discourage "third degree" practices by police during such "custodial interrogations," courts in these cases have required the state to prove not only that the defendants knew of their constitutional rights, but that they were expressly informed in clear and unambiguous terms of their right to remain silent, to advice

of counsel, and to refuse to consent to search or seizure of their property.[⊛]

Both the Supreme Court of the United States and this court have made it clear, however, that these "prophylactic" rules and requirements for application during the "custodial interrogation" are "not intended to hamper the traditional function of police officers in investigating crime," including the interrogation of suspicious persons in their homes, in the presence of friends or relatives, and before the process has shifted from investigatory to accusatory. See *Miranda, supra,* at 477-478, including n. 46.[⊛] See also *State v. Cook, supra,* at 514. In *State v. Taylor, supra,*

---

[⊛] In Orozco v. Texas, 394 US 324, 89 S Ct 1095, 22 L ed 2d 311 (1969), the Court extended the *Miranda* rule to interrogation after arrest in defendant's bedroom. That case involved Fifth Amendment violations by admission of statements made during interrogation, rather than Fourth Amendment violations by admission of evidence seized without a warrant.

But see Phillips v. People, 170 Colo 520, 462 P2d 594 (1969), a search and seizure case, in which the Colorado court rejected the views as expressed by this court in *Williams* and held that because the Supreme Court of the United States, since its decision in *Miranda,* has not expressly extended the rule of that case to searches and seizures, the Colorado court would not do so, but would determine whether consent to search was voluntary in fact depending on the circumstances of each case.

[⊛] See also 67 Colum L Rev, *supra* note 4, at 137-138, and Wallenstein, Consent Searches, 4 Crim L Bull 509, 519-25 (1968).

It has been contended, however, that all searches and seizures without warrants should be held invalid, regardless of consent, unless the police give an affirmative warning of the right to refuse consent to a search without a warrant. See 67 Colum L Rev, *supra* note 4, at 148; Dittmeier, Consent Search: Waiver of Fourth Amendment Rights, 12 St. Louis U LJ 297, at 308; and Consent Searches—Relinquishment of Fourth Amendment Rights—The Need for a Warning, 5 Gonzaga L Rev 315 (1970).

See also United States v. Moderacki, 280 F Supp 633, 636 (D Del 1968); United States v. Blalock, 255 F Supp 268 (ED Pa 1966).

at 271, we held that this includes on-the-scene interviews of persons not in custody to determine whether a crime has been committed and who did so. See also *State v. Evans,* 241 Or 567, 407 P2d 621 (1965); *State v. Little,* 249 Or 297, 431 P2d 810 (1968); and Annot., 31 ALR3d 565, at 579 (1970).

It is true that in *Miranda* the Supreme Court of the United States stated, at 444, that the "prophylactic" rule of that case also extends to a defendant who is "[O]therwise deprived of his freedom of action in any significant way." See also *Orozco v. Texas,* 394 US 324, 89 S Ct 1095, 22 L ed 2d 311 (1969). As yet, however, neither that court nor this court has extended the "prophylactic" rule of *Miranda* to require an affirmative warning of Fourth Amendment rights in cases in which requests for consent to search have been made by police to persons in their homes or hotel rooms, at least when, as in this case, such persons have admitted full knowledge of such rights. Cf. *State v. Travis,* 250 Or 213, 441 P2d 597 (1968), and dissenting opinion by HOLMAN, J., in *State v. Williams, supra,* at 94.

It is true, as stated by the dissent, that the city marshal testified the defendant was not free to go. The state police officer, however, who was in charge of the investigation, testified that at the time when defendant opened his suitcase the police did not yet know anything had been taken from the service station; that the officers had no reason to hold him at that time, but had no more than "suspicion" and that defendant would have been permitted to go if he had so requested. In addition, there was no evidence defendant was told that he was not free to go. The mar-

shal also testified that, despite the "suspicions" of the officers, defendant was not yet a "focal suspect."

Thus, in this case there was substantial evidence to support the findings by the trial court that defendant was not yet a "focal suspect" and was not under arrest or in the "custody" of the police.[⑩] Indeed, although the police were suspicious of the defendant, they were still investigating a report that the service station across the street from defendant's motel room had been broken into.[⑪]

It follows, in our view, that at the time of the request for permission to examine the contents of defendant's suitcase, he was not being subjected to "custodial interrogation" within the meaning of *Miranda* and *Williams,* as we understand these decisions. That the "setting" may have been somewhat "coercive in character" (as also contended by the dissent) is not of itself sufficient, in our view, as a showing that constitutional standards of due process have been violated, so as to require proof of affirmative warning of Fourth Amendment rights to one who has admitted full knowledge of such rights. Indeed, there may be a substantial element of "coercion" present in most, if not all, police interrogations, regardless of the place, persons present, or other circumstances.

For all of these reasons, we hold that under these facts and circumstances the police officers were under no duty to affirmatively inform defendant of his constitutional right to refuse consent to a search of his suitcase before asking if he would consent to

---

[⑩] For what constitutes "custodial interrogation," see Annot., 31 ALR3d 565 (1970).

[⑪] Cf. State v. Cook, 242 Or 509, 514, 411 P2d 78 (1966).

an examination of its contents. To hold otherwise would, in our view, emphasize form over substance and permit the making of a "game" out of the use of Fourth Amendment rights by defendants who have admitted knowledge of such rights.

■ The question remains, however, whether defendant's act of opening his suitcase was involuntary or coerced (both as a question of fact and also as a matter of constitutional due process) not because of the "setting" alone, but because of the testimony that before doing so defendant was told both by the officers and also by his brother-in-law that otherwise the officers either *would* or *would attempt* to get a search warrant. Cf. *Ball v. Gladden, supra,* at 487. As yet neither the Supreme Court of the United States nor this court has decided this question and the decisions by other courts are in some conflict.

In *Pekar v. United States,* 315 F2d 319 (5th Cir 1963), consent to search of luggage by a defendant was held to be invalid even without any statement by the officers that otherwise they would get or apply for a warrant. It did not appear, however, that the defendant knew of his right to demand a search warrant. And in the later case of *United States v. Boukater,* 409 F2d 537 (5th Cir 1969), the same court (at p 538) distinguished between statements by officers that they would *attempt* to get a search warrant if consent were refused from statements that they *would* get a search warrant.

In most cases, however, the courts have sustained searches following findings that consent by defendants was voluntary even after being told by officers that otherwise they would, could, or were going to get search warrants. See *United States v.*

*Myers,* 378 F2d 398, 399 (3d Cir 1967); *Hamilton v. State,* 260 F Supp 632, 633 (ED NC 1966); *Simmons v. Bomar,* 230 F Supp 226, 229 (MD Tenn 1964); *Kershner v. Boles,* 212 F Supp 9, 10 (NDWVa 1963); *United States v. Haas,* 106 F Supp 295, 296 (WD Pa 1952); *Gatterdam v. United States,* 5 F2d 673, 674 (6th Cir 1925); *Thurman v. State,* — Tenn —, 455 SW2d 177, 180 (1970); *State v. Hamilton,* 264 NC 277, 141 SE2d 506, 512 (1965); *State v. Yoss,* 146 Mont 508, 409 P2d 452, 455 (1965); and *People v. Rupar,* 53 Cal Rptr 70, 71, 244 Cal App 2d 292 (1966). See also *United States v. Curiale,* 414 F2d 744, 747 (2d Cir 1969); *United States v. Boukater, supra,* at 538 n.2; and *United States v. Manarite,* 314 F Supp 607, 613 (SDNY 1970). But see *United States v. Baldocci,* 42 F2d 567 (ND Cal 1930); *United States v. Minor,* 117 F Supp 697, 698 (ED Okla 1953); and *State v. Lewis,* 80 NM 274, 454 P2d 360, 363 (1969).

None of those cases discuss the distinction, as stated in *Boukater,* between a statement by an officer that if consent were refused he *would* get a search warrant, which might be considered as coercive and improper in the absence of a showing that the officers then had good cause and sufficient grounds for getting a search warrant, as compared with a statement by an officer that he would *apply for* or get a search warrant. In one of the cases, however, the court expressly held that:

"There was no threat of the officers doing anything other than they had a legal right to do."⑳

It is also significant that few of those cases dis-

---

⑳ See People v. Rupar, 53 Cal Rptr 70, 73, 244 Cal App 2d 292 (1966).

cuss the question whether the defendant in such cases
had actual knowledge of their right to refuse to con-
sent to search in the absence of the production of
search warrants.[9] In addition, findings that consent
was voluntary was sustained in some of these cases
even after defendants had been arrested and placed

----

However, in Simmons v. Bomar, 230 F Supp 226, 229 (MD
Tenn 1964), the court pointed out that the officer in that case
had sufficient information to have probable cause to obtain a
search warrant at the time of asking defendant whether he could
"look around" and stating that otherwise the officers would get
a warrant. Thus, it was held that the officers did not secure con-
sent by misrepresentation or mistake, as might have been the
case if they did not then have sufficient information to get a war-
rant. But in such an event there would still be no misrepresen-
tation for the officer to state that he would "try" or "attempt" to
get a search warrant.

[9] See Consent Searches: A Reappraisal after Miranda v.
Arizona, *supra* note 4, at 132, in which it is also pointed out, at
147, that since the Fourth Amendment prohibits only "unreason-
able" searches and seizures, proof of a "waiver" in the strict
sense of an intentional relinquishment of a known right may not
be required with the same strictness as required for the waiver
of Fifth Amendment rights. See also Requirements of an Effect-
ive Consent to a Warrantless Search, *supra* note 6, at 411.

In addition, as pointed out in Consent and the Constitution
after Bumper v. North Carolina, *supra* note 6, at 322, one of the
most significant features of that decision (391 US 543, 88 S Ct
1788, 20 L ed 2d 797 (1968)), is the fact that "conspicuously ab-
sent from the opinion is any mention of the words 'intelligent,'
'knowing' or 'understanding,'" but held only (at 548) "[T]hat
consent was in fact, 'freely and voluntarily given.'"

Other writers contend that for consent to a search without a
warrant to be valid there must be an actual waiver of Fourth
Amendment rights in the sense of an intentional relinquishment
of a known right. See White, Effective Consent to Search and
Seizures, 113 Pa L Rev 260, 267 (1964), and Consent Search:
Waiver of Fourth Amendment Rights, *supra* note 9, at 298.

To the same effect, see Gladden v. Pogue, 384 F2d 920 (9th
Cir 1967); Channel v. United States, 285 F2d 217, 219-221 (9th
Cir 1960); United States v. Blalock, 255 F Supp 268, 269 (ED Pa
1966), and Porter v. Ashmore, 298 F Supp 951, 955 (D SC 1969).
See also Higgins v. United States, 93 US App DC 340, 209 F2d
819 (1954), and United States v. Shropshire, 271 F Supp 521 (ED
La 1967).

in custody.⑨ Indeed, it is difficult to reconcile the variety of views expressed by the various cases and authorities on the subject of consent searches.⑩

In this case, however, as previously stated, defendant was not under arrest or detention. It is also important to note again that the defendant in this

---

⑨ See United States v. Myers, 378 F2d 398 (3d Cir 1967); State v. Yoss, 146 Mont 508, 409 P2d 452 (1965); Kershner v. Boles, 212 F Supp 9 (ND WVa 1963), and Hamilton v. State, 260 F Supp 632 (ED NC 1966).

⑩ This variety of views includes, among others, the following:

1. View that consent searches may be invalid regardless of what the officers say or fail to say to the suspect, for the reason that a request by a police officer that a suspect consent to a search is inherently coercive and that "acquiescence" to such a request is not valid as consent to such a search. Lane v. Super Ct in and for County of San Bernardino, 76 Cal Rptr 895, 271 Cal App 2d 821 (1969).

2. View that validity of consent searches may depend upon affirmative warning of right to refuse consent.

   (a) View that in *all* consent search cases the officers must first give such a warning. See note 9, *supra*.

   (b) View that such a warning must be given in some, but not all circumstances, such as when suspect is in custody and under "custodial interrogation." State v. Williams, 248 Or 85, 432 P2d 679 (1967), and note 9, *supra*.

   (c) View that such a warning is not necessary in any case until and unless United States Supreme Court extends *Miranda* rule to search and seizure cases. Phillips v. People, 170 Colo 520, 462 P2d 594 (1969).

3. View that validity of consent search may depend upon whether suspect had knowledge from other sources of his right to refuse such consent.

   (a) View that consent must be intelligent as well as voluntary; i.e., a waiver of the right to refuse consent by intentional relinquishment of a known right. See note 13, *supra*.

   (b) View that in consent search cases the state need prove only that such consent was given voluntarily,

case expressly admitted knowledge of his right to refuse to consent to the search in the absence of a search warrant. Also, there was testimony in this case, although conflicting, to support the finding by the trial court that defendant was told that if he refused to consent to the search the officers *would apply for* or *try to get,* a search warrant, rather than that they *would get* a search warrant.

Since the primary issue to be decided is whether the consent was voluntary or was coerced, we doubt whether the ordinary person, when confronted with a request by an officer to consent to a search, would discriminate between the statement that otherwise the officer would *get* a search warrant, as compared with a statement that otherwise he would *apply for* a warrant. If, however, it be considered that such a distinction has controlling significance, and if it also be considered that the evidence in this case was not sufficiently "clear and convincing" to establish that the officer told defendant that otherwise he would *apply for* a warrant, rather than *get* a warrant, we nevertheless reach the same result under the facts and cir-

---

without coercion, and has no burden to prove that the suspect knew of his right to refuse consent. See note 13, *supra.*

4. View that validity of consent searches may depend upon what officers tell suspect about getting a search warrant.

   (a) View that consent search may be valid if officer tells suspect that otherwise he will *apply* for a warrant, but not if he says that otherwise he will *get* a warrant. United States v. Boukater, 409 F2d 537 (5th Cir 1969).

   (b) View that consent search may be valid regardless of whether officer tells suspect that otherwise he will either get or apply for a warrant. See United States v. Myers, 378 F2d 398 (3d Cir 1967), and other cases cited above.

cumstances of this case. This is because the defendant in this case testified that what finally "prompted" him to open the suitcase was what his brother-in-law (not the officers) did and said. Thus, he testfied that his brother-in-law "kept after me to open the suitcase" and told him, when he said he would "wait for the search warrant," that "they have got it." In addition, this is not a case in which defendant merely gave verbal consent to a search. Instead, defendant deliberately opened his suitcase, dumped out the contents and did so not only once, but twice.

Under these facts, together with all of the other circumstances of this case, we hold that there was sufficient evidence to support the finding of the trial court that the consent by this defendant to the search of his suitcase was a voluntary and intelligent consent to that search and was not improperly "coerced" by any conduct of the police officers. Under these same facts and circumstances, we hold that the search of defendant's suitcase was a "reasonable" search and one which satisfied "constitutional standards of due process."

For these reasons we affirm the decision of the Court of Appeals which, in turn, affirmed the decision of the trial court and the conviction of the defendant.

Affirmed.

BRYSON, J., specially concurring.

I concur in the result. On the facts, this is not a *Miranda* case. Defendant was under arrest, in the custody of two police officers. Therefore, the search was pursuant to a lawful arrest. *State v. Hoover*, 219

Or 288, 347 P2d 69 (1960); *State v. Elk,* 249 Or 614, 439 P2d 1011 (1968).

The evidence disclosed that some of the stamps in the suitcase of the defendant had been removed and placed in the bathroom where they could be disposed of easily.

The purloined goods, "stamps," were subject to "flushing," the same as drugs or any other disposable item the subject of reasonable search, and this case falls in the same category as such search and seizure cases involving drugs. *State v. Peterson,* 3 Or App 17, 469 P2d 40 (1970); *State v. Murphy,* 2 Or App 251, 465 P2d 900 (1970).

I do not believe the rules laid down by the United States Supreme Court pursuant to the Fifth Amendment to the United States Constitution should be extended to rights under the Fourth Amendment to the United States Constitution. Therefore, I would overrule *State v. Williams,* 248 Or 85, 432 P2d 679 (1967), as set forth in the dissent of Mr. Justice HOLMAN in that case. *See also Phillips v. People,* 170 Colo 520, 527, 462 P2d 594, 597 (1969).

HOLMAN, J., concurring.

I agree with the dissenting opinion of the Chief Justice insofar as it holds that the coercion which results from threatening to do what the law requires is not the kind of coercion which invalidates permission to search.

However, I believe it was not necessary to inform defendant of his constitutional rights prior to getting his consent to search, for the same reasons

specified in my dissent in *State v. Williams,* 248 Or 85, 94, 432 P2d 679 (1967).

O'CONNELL, C. J., dissenting.

This case presents two principal questions: (1) whether the consent to search was obtained by improper coercive methods, and (2) assuming that coercion did not vitiate the search, whether it was necessary to inform defendant of his constitutional rights before making the search.

The majority opinion concludes that the consent to the search was voluntary because defendant testified that he was prompted to open the suitcase as a result of his brother-in-law's influence and not that of the officers. In addition, importance is attached to the circumstance that defendant did not merely give his verbal consent to the search but deliberately opened the suitcase and dumped out its contents. It is not made clear why this latter circumstance is important.

It is unnecessary to rest the decision on the foregoing evidence. The officer's threat that he would obtain a warrant if defendant did not consent to the search did not constitute the kind of coercion that renders a search involuntary. Concededly such a threat may be coercive in the sense that an accused would not have consented to the search in the absence of the threat. But not all coercion inducing consent to a search is constitutionally impermissible. If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable.

The majority holds that defendant was not en-

titled to be informed of his constitutional rights because he was not yet a "focal suspect" and was not under arrest or in the "custody" of the police. I disagree. In my opinion accused was clearly a focal suspect at the time he was interrogated. Even if we were to accept the view that the facts must be sufficient to establish probable cause before a person is a focal suspect, there were such facts in the present case.[1] And at the time the police elicited the information from the accused, he was "deprived of his freedom of action" in a "significant way." *Miranda v. Arizona,* 384 US 436, 444, 86 S Ct 1602, 16 L Ed2d 694, 706 (1966). The city marshal testified that the accused would have been detained if he had attempted to leave. As I indicated in my dissent in *State v. Travis,* 250 Or 213 at 218 *et seq,* 441 P2d 597, 599 (1968), I would not limit the application of *Miranda* to the interrogation in a coercive environment. But it is not necessary to adopt that view in this case because the setting was coercive in character.[2]

In *State v. Williams,* 248 Or 85, 432 P2d 679 (1967) we held that pre-interrogation warnings are necessary not only where a confession is sought but also where the interrogation is aimed at obtaining the defendant's consent to search and seizure. The

---

[1] This court has held that a focal suspect is "one whom the police have probable cause to arrest * * *." State v. Travis, 250 Or 213, 216, 441 P2d 597 (1968); *cf.,* State v. Cook, 242 Or 509, 514, 411 P2d 78 (1966). In order to have probable cause, "[t]he officer must have probable cause to believe in the guilt of the suspected party; that is, circumstances must exist which would lead a reasonably prudent man to believe in the guilt of the accused." State v. Elk, 249 Or 614, 619-20, 439 P2d 1011 (1968). *See also* State v. Shaw, 3 Or App 346, 473 P2d 159 (1970); United States v. Pasterchik, 267 F Supp 44 (D Oregon 1966).

[2] Cf, Orozco v. Texas, 394 US 324, 89 S Ct 1095, 22 L Ed2d 311 (1969); Windsor v. United States, 389 F2d 530 (5th Cir 1968).

principle announced there should be applied in the present case. There was no warning prior to interrogation. Therefore, the evidence disclosed by the search should have been suppressed.

McALLISTER, J., dissenting.

I agree with the Chief Justice that the defendant was "a focal suspect at the time he was interrogated" and, as such, entitled to be informed of his constitutional rights under *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed2d 694 (1966). I therefore dissent.