Argued May 25, affirmed July 16, 1973

## STATE OF OREGON, *Appellant, v.* DONALD HERBERT JOHNSON (No. C-72-10-3334 Cr), *Respondent.*

511 P2d 1258

*John W. Osburn,* Solicitor General, Salem, argued the cause for appellant. With him on the brief was Lee Johnson, Attorney General, Salem.

*Charles R. Harvey,* Portland, argued the cause and filed the brief for respondent.

Before Schwab, Chief Judge, and Fort and Thornton, Judges.

FORT, J.

Defendant was charged with the crime of possession of a stolen motorcycle. ORS 481.990. He filed a motion to suppress certain evidence seized in the garage of his home. The trial court suppressed the challenged evidence and the state appeals.

Two searches were conducted of defendant's garage, each without a warrant and neither incident to an arrest. Thus the burden is upon the state to establish the existence of probable cause to make the search for and seizure of the challenged evidence. *State v. Keller,* 265 Or 622, 510 P2d 568 (1973) ; *State v. Sagner,* 12 Or App 459, 506 P2d 510, Sup Ct *review denied* (1973) ; *State v. Douglas,* 260 Or 60, 68, 488 P2d 1366 (1971), *cert denied* 406 US 974 (1972) ; *State v. Elkins,* 245 Or 279, 422 P2d 250 (1966).

The facts gleanable from an inadequate record and necessary to an understanding of the case are as follows:

At about 2:30 a.m., a man was shot while sitting in the kitchen of defendant's home. It is not contended that the defendant or any member of his family was responsible for or involved in that shooting. Defendant and his wife transported the wounded man to the hospital. En route they were stopped by a police car, which then followed them to the hospital. The wounded man was discovered to be dead upon his arrival at the hospital. Thereafter defendant and his wife accompanied the police officer in his car to the police station. There the police took statements

from them. No arrests were made. The police then drove defendant and his wife back to the hospital where they picked up their own car and returned to their home followed by the police, arriving there between 4 and 4:30 a.m. When they had left their home to go to the hospital at least three of their minor children, the oldest of whom was 12, were at home asleep. When they arrived home the premises including an unattached garage were occupied by the police, and an investigation and search of the entire premises was in progress.

Here the motion to suppress implies that the defendant gave the officers consent to search his residence where the homicide occurred, but expressly denies that any consent to enter the garage was given. It is clear from the state's evidence, infra, that the garage was not a part of the dwelling as defined in ORS 164.205 (2).[①] The state offered no evidence to support its contention that the defendant, even in connection with the homicide investigation, authorized entry into the garage. The defendant denied it also at the hearing.

The state called but one witness, Officer Hawkins, a detective in the Auto Theft Division of the sheriff's office. He testified:

"Q  What were the circumstances under which you had seen this motorcycle on the 18th?  What

---

[①] ORS 164.205:

"As used in ORS 164.205 to 164.255, except as the context requires otherwise:

"*  *  *  *  *

"(2) 'Dwelling' means a building which regularly or intermittently is occupied by a person lodging therein at night, whether or not a person is actually present.

"*  *  *  *  *."

was the time of day and what were you doing there?

"A Approximately 8:00 a.m. on the 18th, we were requested by radio to contact the investigators on the premises of 8628 S. E. Lafayette.

"Q Is that where Mr. Johnson lives?
"A Yes. That's apparently where Mr. Johnson lives.

"Q Ok. Did you go out there that day?
"A We did.

"Q Did you have occasion to go on the premises and particularly the garage?
"A Yes.

"Q How did you—did you have a search warrant?
"A No, we didn't.

"Q How did you get into the garage?
"A The garage was unlocked and opened.

"Q Did you ask any one's permission to go into the garage?
"A There was no one present there except one of our uniformed officers who was guarding the premises. There was another individual asleep on the couch in the living room and a young girl. I presume it's the young lady there in the back there.

"Q So did you have any contact with anybody except police officers?
"A No.

"Q All right. Were police officers in control of the premises?
"A Yes.

"Q How is the garage attached to the premises?
"A It's not attached. It's sets [sic] apart from the premises and a little bit forward of the house, more or less right up to the street edge, if there was a street edge. It's not an improved street.

"Q   It's your testimony then a general investigation was being carried on?

"A   That's correct.

"Q   What kind of crime?

"A   It was a homicide, as I understand.

"Q   All right. What drew your attention to the motorcycle?

"A   (No response.)

"Q   Well, why did you go out in the garage?

"A   We were requested by the homicide investigators to check out the motorcycles that were in the garage on this premises.

"Q   Ok. And what—did you do so?

"A   Yes, we did.

"Q   What did that entail?

"A   Just merely of writing down the serial number of a number of motorcycles that were in the garage area.

"Q   All right. Did you do that?

"A   Yes, we did.

"Q   Did you check those serial numbers?

"A   Yes, we did."

There was no evidence that the serial numbers on any of the motorcycles had been tampered with. Neither the defendant nor his wife were shown to have been present on the premises during this period and had no contact with the auto theft investigating officer at any time prior to the 20th of October. At that time, having identified one of the motorcycles from its number as stolen, the officer returned to the premises, and, after identifying himself as a police officer, obtained the consent of the defendant to enter the garage. There he seized the motorcycle. No warrant to arrest the defendant or to search the premises was secured prior to the seizure.

The court found that at the time of the original search of the garage and the taking of the serial numbers, "the investigation conducted by Sgt. Hawkins was not in relation to the homicide investigation but was in relation to a separate investigation of the motor vehicles in question," and concluded that the subsequent authorized entry into the garage and seizure were tainted by the original unlawful search.

It is conceded here that the police had full custody of the premises at all times prior to and during the search by Officer Hawkins. There was no threat whatever to the destruction or removal of evidence.

Recently in State v. Allen/Reed, 12 Or App 633, 639, 508 P2d 472 (1973), we pointed out:

"* * * With 12 police officers present there was no problem in securing the room by leaving a guard present while the warrant was being obtained. When the police arrested the defendants and removed them from the room, the exigent circumstances that would justify a warrantless search no longer existed.

"While we recognize that, as the trial court concluded, the entire matter was one transaction, the transaction could have been broken into component parts as the Supreme Court said must be done in circumstances such as this in the Chimel [Chimel v. California, 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969)] decision. * * *"

Here, unlike Allen/Reed, no arrest had been made of the defendant or anyone else in connection with the crime charged.

In State v. Sagner, supra, we considered at length the validity of the search and seizure of items

in excess of those authorized by a search warrant. There we held that the seizure of a television set in plain view, on which the serial number was readily observable as having been obliterated and where entry to the premises was made pursuant to a valid warrant for the purpose of seizing other stolen articles named in the warrant was valid, but said:

> "As to the remaining three items which were not inherently suspicious, we must look to the circumstances with which the officers were surrounded to consider whether the combination of those factors was sufficient to establish probable cause to seize those items without a warrant." 12 Or App at 474.

Here not only was there no warrant to search the garage at all, but there was no evidence of obliteration of any serial number or other condition other than the presence of the several motorcycles. The presence of the motorcycles was no more suspicious, certainly, than the typewriter, the photostatic copier and the rifle, the seizure of which we held invalid in *Sagner* as in excess of those items whose seizure was authorized by the warrant.

■■ There is no evidence here to support a conclusion that the medical investigator had entered and taken possession of the premises pursuant to ORS 146.450. We cannot infer such action from a silent record. Nor would such entry itself give the right to search. *State v. Brothers,* 4 Or App 253, 259-60, 478 P2d 442 (1970).

In *Brothers* we also pointed out:

> "In June of 1969, the Supreme Court overruled *Rabinowitz* in *Chimel v. California,* 395 US 752, 89 S Ct 2034, 23 L Ed 2d 685 (1969), and restored the primacy of the Fourth Amendment's warrant

clause. This court interpreted the new rule laid down in *Chimel* in *State v. Keith,* 2 Or App 133, 465 P2d 724, Sup Ct *review denied* (1970). In that case this court suggested that a policeman ask himself two questions before making a warrantless search:

" '(1) Do I have *probable cause* to believe that a search of the person or place in question will result in the finding of evidence of crime?

" '* * * * * *

" '(2) Do I have *probable cause* to believe that I must immediately search without taking the time to seek and obtain a warrant: (a) in order to protect myself (or others in the immediate vicinity), or (b) in order to avoid the loss of evidence, or (c) in order to prevent the escape of the accused, or (d) for any other reason which outweighs the need for judicial surveillance over police activity which the search warrant provides?' 2 Or App at 142-43.

"*Chimel* and *Keith* establish for the police the necessity of obtaining a search warrant in all but exceptional cases. A search can no longer be justified by a finding that it was 'reasonable.' " 4 Or App at 257-58. (Emphasis supplied.)

■ We agree with the trial judge that the search of the motorcycles in the garage was outside the scope of the homicide investigation, and that it was not authorized by the defendant. We conclude, too, that the state failed to show that at the time the first search was made it was based upon probable cause, and that in any event no exigent circumstances were present justifying the failure to seek a search warrant. The second entry into the garage, based as it was solely upon the fruits of the first unlawful search, and the resulting seizure of the motorcycle, can rise no higher than its source. *Wong Sun v. United States,* 371 US

471, 83 S Ct 407, 9 L Ed 2d 441 (1963). The state does not contend that the defendant had any knowledge of the prior unlawful search of his garage when the officer asked for and obtained permission for the second entry. Nor did he know the second entry was requested in relation to a matter other than the homicide investigation. There was no waiver of his right to object to the prior unlawful search.

Affirmed.

SCHWAB, C. J., specially concurring.

I concur in the opinion of FORT, J., but feel it advisable to add a few comments.

Much has been said about court-made constitutional rules governing search and seizure resulting in suppression of strong evidence of guilt, thus allowing guilty people to go free. This case to me is a classic example of how constitutional requirements can be met without freeing the guilty if the state will but remember what its duties are in a prosecution. The rule which has been enunciated time after time by courts of this country is that when there is a motion to suppress evidence seized as the result of a warrantless search it is incumbent upon the state to produce prima facie evidence of probable cause to search coupled with exigent circumstances obviating the need for a warrant, the existence of some other exception to the general rule that a search is to be made only pursuant to warrant, or that the search was within the scope of consent given by the defendant, or some other person authorized to consent.

Here the state, faced with a motion to suppress, did not even call as a witness any person who had any dealings with the defendant prior to the search. Thus the trial court was required to suppress

the fruits of this search in the face of a situation in which it seems likely that if the state had called the officer who allegedly obtained the consent, the trial court might have very properly reached a different result.

THORNTON, J., dissenting.

In my view the trial judge was in error in suppressing the evidence and dismissing the indictment. The rationale for that ruling is restated in the majority opinion as follows: The discovery and search of the motorcycles in the garage was "outside the scope of the homicide investigation, and that it was not authorized by the defendant." I disagree.

In his motion to suppress the defendant contended:

"* * * [T]he search was not made pursuant to lawful arrest or search warrant and *exceeded the curtilage for which consent was given for search by the officers; and the consent to search defendant's residence was limited to evidence of a homicide committed in defendant's residence*; and *the search was not made pursuant to the consent of the defendant for the search of the garage*; the defendant being the only person in charge of the garage." (Emphasis supplied.)

The issue presented is whether the inspection of the motorcycles on October 18 was unlawful.

Defendant acknowledges in his motion and in argument that he consented to the search of his residence in connection with investigation of the homicide.

In the course of his argument on the motion to suppress, defendant's counsel stated:

"* * * He [defendant] didn't object to them searching the house or anything in connection with

the homocide [sic]. * * * The question is how far we can go astray on investigations * * *."

The trial court noted, in the course of colloquy:

"I don't have any problem as to curtilage. I have a problem as to what you are searching for. * * *"

Later the court said:

"If this was in connection with a homocide [sic] investigation, I think there is probable cause to fine tooth comb the area but it's clear from the evidence that this was not in connection with the homocide [sic] investigation."

The record does not contain evidence of the scope of the consent to search which defendant gave to the police.

In *Drummond v. United States,* 350 F2d 983, 989 (8th Cir 1965), *cert denied* 384 US 944 (1966), the court held that the scope of a consent to search "my residence" included a garage in the backyard of the residence.

Secondly, where police officers are on premises pursuant to a valid consent to search, under the "plain view" rule an item falling into their plain view may properly be seized even if the item is not connected with their purpose in entering. *State v. McGee,* 7 Or App 574, 577-78, 492 P2d 489 (1972); *People v. Harrington,* 2 Cal 3d 991, 88 Cal Rptr 161, 471 P2d 961 (1970), *cert denied* 402 US 923 (1971). *See also, Bretti v. Wainwright,* 439 F2d 1042 (5th Cir), *cert denied* 404 US 943 (1971).

Under the facts of this case I believe that defendant's consent authorized the officers to enter the

garage and check the serial numbers of the motorcycles observed therein. When it subsequently developed that at least one of the cycles in the garage was stolen, the police were authorized to return to defendant's premises to pursue this investigation. The trial judge erroneously applied the "poisonous tree" doctrine.

I would reverse and remand.