Argued January 23, affirmed March 11, 1974

## STATE OF OREGON, *Respondent, v.* JOSEPH WILLIAM BOPP (No. C 73-04-1288 Cr), *Appellant.*

519 P2d 1277

*Thomas D. Kerrigan,* Portland, argued the cause for appellant. With him on the brief was Stephen A. Moen, Portland.

*Rhidian M. M. Morgan,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FORT and THORNTON, Judges.

THORNTON, J.

Defendant was convicted after a bench trial of two counts of criminal activity in drugs. ORS 167.207. Count I of the indictment charged defendant with unlawfully furnishing marihuana (hashish); Count II charged defendant with unlawfully possessing over one ounce of marihuana (hashish).

Defendant moved "to suppress all evidence seized and statements solicited * * * during the course of and following the search of Defendant's residence * * * on the grounds * * * that the police * * * did not have probable cause * * *." After hearing evidence the trial court denied defendant's motion to suppress.

Defendant stipulated to a trial based upon the facts presented during the suppression hearing.

Defendant appeals, contending that the trial court erred:

(1) In denying his motion to suppress and

(2) In receiving the evidence referred to above, despite improper and inadequate advice of his constitutional rights.

Neither of defendant's contentions can be sustained.

The evidence from the hearing is as follows:

Undercover officers of the narcotics detail of the Portland Police Bureau established contact with Claudia Knowles to set up a buy of one pound of hashish for $1,000. Officer Wilson testified that Knowles was to buy the hashish in two successive instalments of one-half pound each. The officers agreed to pay $500 in advance prior to each transfer.

After the undercover officers paid Claudia Knowles $500, she drove away with the announced purpose of picking up the first instalment of the hashish. Other officers surreptitiously followed Knowles to a ranch-style apartment complex in the opposite part of the city. These officers observed Knowles park her car and enter the apartment complex at one end. The officers testified that they thought there was only one apartment at this location, which Knowles appeared to enter. The officers then stationed themselves in the area. A short time later a young man, later identified as the defendant, drove into the parking lot, alighted, and after glancing around the area, placed a small parcel, which appeared to be a hashish package, under his shirt. He then entered the same portion of

the apartment complex where Knowles had disappeared from view shortly before.

Five minutes later Claudia Knowles came out and drove away in her automobile. The officers followed her a short distance away from the apartment complex before stopping her. A half-pound "sole"[1] of hashish was recovered from her purse.[2] The officer who recovered the package of hashish from Knowles testified that it appeared to be identical to the package he had previously observed defendant carry into the apartment complex.

The officers then went directly to that portion of the apartment complex where they had observed the above activity and suspected the transfer had occurred. When they approached, the officers discovered that there were actually two apartment entrances at this location. The officers knocked on the door of one (Apartment Q) and found it to be occupied by an elderly man. After a brief inspection made with the permission of the occupant the officers, realizing they had made a mistake, withdrew. They then immediately knocked on the door of the next-door apartment (Apartment P). The defendant opened the door.

After identifying themselves, one of the officers informed defendant they had reason to believe a large amount of hashish was in the apartment and that they

---

[1] The term "sole" was defined by one of the arresting officers who testified as follows:

"It's a description for the type of hash that was — it was in small, thin brick form. Called a sole because of its shape; shaped in a sole because it was carried at times under the foot between the shoe."

[2] These undercover officers were not the same officers who originally arranged the "buy" with Knowles. However, they did observe the coming and going of both Knowles and defendant at the apartment complex.

wished to search the premises. Officer Gearheart then started to advise defendant of his *Miranda* rights. (*Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).) Defendant interrupted, asking the officers to suspend and to step inside, so as not to alarm the neighbors. The officers complied and thereafter Officer Gearheart recommenced the statement of defendant's rights, as follows:

"I readvised him of his right to remain silent, that anything he said would be used against him in court, that he had the right to have an attorney present during any questioning or interviewing, that — and he could terminate the interview at any time or stop his voluntary statements whenever he so desired. If he was arrested and unable to afford an attorney the State would provide one for him. I then asked him if he understood what I told him, and he replied that he did."

After concluding the statement, the officers made a cursory check of the apartment to secure it and to prevent any destruction of evidence. Defendant's apartment was found to be occupied by defendant, a young woman and a small baby. Defendant asked the officers if they had a search warrant. Officer Gearheart replied:

"A   I stated we did not.

"Q   Did you tell him that you didn't need one?
"A   Yes, I believe that I did.

"Q   That you were going to search anyway regardless.
"A   I can't recall. Perhaps, I could have said that."

Officer Gearheart testified that defendant at first denied there was any hashish in the apartment, but after being shown the hashish just confiscated from

Claudia Knowles, defendant admitted that "that was all that he did have, and that was all that he could buy."

Officer Gearheart further testified:

"Q Was a search then conducted of the apartment?

"A Yes.

"Q Will you just explain to the Court how you went about conducting that search; what were the circumstances that lead up to it.

"A Well, I told Bopp at that time that he by his statement that was all that he could buy and the fact that we had observed a person who was a defendant at that time leave his apartment with hashish, and his statement that was all that he could buy, that and the fact that no one had entered or left the apartment, and that all the persons who were within the apartment would have knowledge what transpired, that at this time he would be subject to arrest and all persons in the apartment could be subject to arrest. At that time Bopp stated that his girlfriend or fiancee, whatever she was, had no involvement.

"Q Was she there at that time?

"A She was. She was there when I advised him of his rights too.

"Q Was there any other than police officers besides the defendant and his girlfriend?

"A There was a young baby in one of the bedrooms.

"Q Go on.

"A And he stated that Sheila had no knowledge of the, or no involvement with the actual sale of the hashish, and that if we would not arrest Sheila or not take the baby away from her that he would take me to the additional hashish.

"Q Did you agree to those terms?

"A Yes I did.

"Q Did he show you the rest of the hashish?

"A Yes he took me to the cupboard, a lower cupboard, in the kitchen and he told me it was in the cupboard. He removed from the cupboard two additional soles of hashish."

Defendant was thereupon arrested for criminal activity in drugs.

Following his arrest defendant was asked for positive identification. When he (defendant) produced his wallet and commenced to look for his identification, the officers observed a large amount of currency in the wallet. The money was examined and the serial numbers on the bills were found to correspond with the money the undercover officers had earlier paid Claudia Knowles. The officers therefore impounded it.

It is obvious from the above evidence that after the officers recovered the "sole" of hashish from Claudia Knowles, they had probable cause to arrest defendant for selling the hashish to Knowles. Defendant was observed going into the apartment with what appeared to be hashish; Knowles came out with what appeared to be a package of hashish. The issue on appeal concerns the events that occurred thereafter.

■ We do not agree with the contention of the parties below that this case involves a search and seizure. There was no search. When the officers came to defendant's apartment, defendant was a prime suspect in the sale of the hashish recovered from Knowles. The evidence obtained from defendant's apartment, and the incriminating statements made by defendant, were the result of police interrogation after *Miranda* warnings had been given. The questions then become: (1) were the *Miranda* warnings correctly given and (2)

was defendant's act of turning over the hashish voluntary or coerced?

■ The warnings given by Officer Gearhart, as previously set forth, are in substantial compliance with *Miranda v. Arizona*, supra. Substance, rather than form, is the controlling element. *State v. Williams*, 1 Or App 30, 37, 458 P2d 699 (1969). Defendant's admission ("that was all that he could buy") followed his assertion that he understood the warnings. The admission was therefore admissible.

As to the second question, whether defendant was coerced by the officers, the alleged coercive conduct was the officer's statement that they had enough evidence to arrest both defendant and his girlfriend. Immediately thereafter, defendant told the officers that his girlfriend was not involved and that he (defendant) would show them (the officers) the additional hashish if they (the officers) would not arrest the woman.

As we said in *State v. Evans*, 1 Or App 489, 495, 463 P2d 378, Sup Ct *review denied* (1970),

"* * * because a defendant chooses to make a statement in the hope or belief that it will exculpate or gain leniency for his wife or anyone else does not render it inadmissible. It is only where there is coercion imposed upon the defendant by the authorities that there is ground for its exclusion."

■ Here the arrest of the woman for frequenting a place used for the unlawful keeping and sale of narcotic drugs would have been authorized. ORS 167.222 (1) (b).⁹ Therefore the threat to arrest her was not

---

⁹ ORS 167.222 (1) (b) provides:

"(1) A person commits the crime of criminal drug promo-

constitutionally objectionable coercion because the officers threatened "only to do what the law permits them to do." *State v. Douglas,* 260 Or 60, 81, 488 P2d 1366 (1971) (opinion of O'CONNELL, C. J., dissenting on other grounds), *cert denied* 406 US 974 (1972). We therefore conclude that defendant was not coerced into making incriminating statements nor into doing any incriminating acts. The hashish was voluntarily turned over to the officers. *State v. Douglas,* 260 Or 60, 79, 488 P2d 1366 (1971), *cert denied* 406 US 974 (1972); *accord, State v. Matt,* 251 Or 134, 444 P2d 914 (1968); *State v. Evans,* supra.

Affirmed.

---

tion if he knowingly maintains, frequents, or remains at a place:

"* * * * *

"(b) Which is used for the unlawful keeping or sale of narcotic or dangerous drugs."