Argued November 1, 1966, reversed and remanded October 13, 1967

## STATE OF OREGON, *Respondent, v.* ZENITH CHARLES WILLIAMS, Jᴿ., *Appellant.*

432 P. 2d 679

*D. S. Denning, Jr.,* Vale, argued the cause for appellant. With him on the briefs were Schroeder & Denning, Vale.

*John N. Hutchens,* District Attorney, Vale, argued the cause and filed a brief for respondent.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

O'CONNELL, J.

Defendant appeals from a judgment of conviction for the crime of burglary.

Defendant, aged 19, and Steven Lee Caughennower, aged 17, were employed by Pacific Supply Co-op in Ontario, Oregon. On September 25, 1965, it was discovered that the Co-op had been burglarized. Defendant and Caughennower quit their employment with the Co-op on September 30 and were paid on the following day. The Co-op manager notified Officer Edmondson of the Ontario police that defendant and Caughennower had quit and were about to leave town. Edmondson requested Sheriff Rowan to search out defendant and Caughennower and get their names, addresses and physical description. The sheriff stopped defendant and his companion while they were walking down the street in Ontario at approximately 12:30 p.m., October 1st. Upon being asked to identify themselves one of the boys, Caughennower, gave a name other than that which the Co-op manager had given

to the police. The sheriff then requested the boys to accompany him to the police station. The sheriff testified that he took them to the police station because they might be runaways since they appeared to be minors, far from their home (Alaska) and without adequate identification. At the police station they were charged with vagrancy on the ground that there was reason to believe that they were lying about their names, and because they appeared to be minors far away from home, without work, and with meager finances.[1] They were required to turn over their belongings to the police for safekeeping. Among the items turned over was a key to a locker in the Ontario bus station. Upon being questioned, defendant told the police that the locker contained two bags, one belonging to defendant and the other to Caughennower. Defendant gave the police permission to pick up the bags. Officer Edmondson testified that defendant also gave permission to the police to examine the contents of the bags. The police testified that the questioning concerning the key was not for the purpose of investigating the burglary but to establish the identity of the boys. One of the bags contained items stolen from

---

[1] The vagrancy ordinance for the city of Ontario provides in part as follows:

"Section 1. All persons, who are physically able to work, who have no visible means of living, or lawful occupation or employment, by which to earn a living; all healthy, or able-bodied men, who are physically able to work, who shall be found begging means of support; all idle or dissolute persons who live in and about or frequent houses of ill fame; all persons who have no known occupation or business, who shall be found wandering about the streets after the hour of 10:00 p.m. shall be deemed vagrants."

The only part of the ordinance that arguably could apply to defendant is the first classification, i.e., "All persons who are physically able to work, who have no visible means of living, or lawful occupation or employment * * *."

the Co-op. These items were identified by the manager of the Co-op at 3:00 p.m., October 1st.

Defendant was then informed of his constitutional rights for the first time and was interrogated concerning the Co-op burglary. After approximately two and one-half hours of questioning defendant confessed (9:00 p.m.). Defendant confessed before he learned that the police had discovered the stolen items. On Monday, October 4, defendant was brought before a magistrate on the vagrancy charge and after pleading guilty to that charge he was sentenced to seven days in jail.

On October 6th, while serving the sentence for vagrancy, defendant was again taken before a magistrate and was charged with burglary. The magistrate informed him of his constitutional rights, whereupon he requested the services of counsel. The trial court denied defendant's motion to suppress the evidence obtained by the police from the bus locker, and overruled defendant's objections to the admission of that evidence.

Defendant argues that the evidence should not have been admitted because the search and seizure were not incident to the arrest for vagrancy and could not be sustained as an incident to an arrest on the burglary charge because defendant was not informed of his constitutional rights prior to the interrogation which eventually led the police to the incriminating evidence. Defendant's confession, it is argued, does not cure the previous illegal search and seizure because it is possible that defendant would not have confessed if the previous disclosure had not been made. Finally, defendant argues that he was not promptly brought before a magistrate and thus ORS 133.550 and 136.545 were violated.

The reason for the arrest and interrogation is disclosed in the testimony of Officers Edmondson and Rowan. Officer Edmondson testified as follows:

"Q. Why were you interested in obtaining the defendant's name and address and various other questions?

"A. I wanted the defendant and the subject that was with him's names, addresses, and physical description, for a matter of record.

"Q. A matter of record for what?

"A. Due to information that I had received that morning, that they were going to leave town, and I merely wanted their names, physical description and addresses in case something should come up concerning this burglary which has been brought up here.

"Q. Therefore, you wanted this information because of the burglary and for no other reason, is that correct?

"A. Correct.

"Q. It wasn't for any other purpose whatsoever that you wanted the information, other than the burglary, is that correct?

"A. That's correct.

"Q. Now, why did you want their names and all of this other information concerning them about this burglary?

"A. During the course of the morning, I had numerous conversations with the—not numerous, but a conversation with the manager of the Co-op and he called and advised me that the two boys that were working for him were leaving town. And at the time I had no knowledge of what he was talking about or what the matter concerned. I called Sergeant Alexander and through talking to him, he told me the story about the burglary, about the investigation.

"Q. And that these two boys had been working at the Vale—or the Co-op Supply?

"A. Yes.

"Q. And that they were suspects in that robbery?

"A. No, Sergeant Alexander, through talking to him that morning, I asked him if he had gone into if these boys had came into the question concerning the burglary and he said 'Yes, they had.' And that it had been decided between him and another officer, I'm not sure who he said now, they were quite certain that the boys weren't involved in it in any way.

"Q. And if they weren't involved, the sole purpose that you wanted to get this information from them was concerning their possible implication in this burglary, is that correct?

"A. Yes.

"Q. Therefore, they were suspects, weren't they? Let's don't quibble over words.

"A. Well, if you want to call them 'suspects,' I suppose you could; I have denied that they weren't.

"Q. All right. Did you tell the Sheriff Rowan to pick these boys up and bring them in?

"A. No, I did not.

"Q. When they came in to your city police office, was that the first time that you had seen the defendant?

"A. Yes, it was.

"Q. At that time did you give him any warning as to his right to remain silent or his right to counsel?

"A. No, I didn't."

Mr. Rowan, the deputy sheriff, who first questioned the boys, testified as follows:

"Q. Mr. Rowan, did Mr. Edmondson, when he asked you to go talk to the two boys, use the word

—he wanted you to get the information, did he use the word, 'suspects'?

"A. No, I wouldn't say that he said 'suspects' he said that they might be involved in it or something of that nature. I can't say the exact words.

"Q. Did he tell you the purpose for which he wanted you to get the information?
"A. Yes.

"Q. What?
"A. That there had been a break-in at the Pacific Supply Co-op and these two boys had been working there.

"Q. Did he indicate to you why that required knowledge of their names?
"A. Well, mainly in case something come up later that they would have a record and a description of these boys.

"Q. Now, Mr. Rowan, possibly you misunderstood my question, I asked you did Mr. Edmondson indicate to you the reason—I don't want a reason that you are making up on your own or what would be a logical reason, did Mr. Edmondson indicate the reason?
"A. Yes, he said he wanted a record of their description and everything and who they were.

"Q. Then you went on to say just a minute ago, 'in case something else came up later,' did Mr. Edmondson indicate that or did you arrive at that as a logical reason on your own?
"A. I could have arrived at that as a logical reason of my own. I don't recall the exact words Officer Edmondson did say, but it was in general."

The above testimony of the police officers, conclusively establishes that the arrest was not made because defendant was charged with a violation of the vagrancy ordinance but because Officer Edmondson wanted in-

formation concerning defendant and his companion "in case something should come up concerning this burglary." He admitted that this was the "sole purpose" for the questioning. It is evident, therefore, that the arrest was not made for a violation of the vagrancy ordinance as the state contends, but for another purpose. We have here another instance of a not uncommon police practice, at least in some states, of using a vagrancy ordinance or statute as a device for arresting a person on the suspicion that he has committed another crime which is then being investigated by the police.[8] It has been held that an arrest under such circumstances is illegal.[9]

But it is not necessary for us to rest our holding in this case on the illegality of defendant's arrest because his constitutional rights were violated on another ground. The interrogation which led to the disclosure concerning the location of the bags in the bus station locker took place while defendant was in the custody of the police at the police station. From the record in this case it is patent that at the time defendant was interrogated by the police he was a focal suspect of the burglary of the Co-op. The suspicion was confirmed when the police discovered the fruits of the

[8] See Douglas, Vagrancy and Arrest on Suspicion, 70 Yale L J 1 (1960).

[9] See Taglavore v. United States, 291 F2d 262 (9th Cir 1961); Riddlehoover v. Florida, 198 So2d 651 (Fla Ct App 1967); State v. Michaels, 60 Wash2d 638, 374 P2d 989 (1962). But cf., Edwards v. State, 319 P2d 1021 (Okl Cr 1958); Stout v. State, 214 P2d 271 (Okl Cr 1950). See also State v. Christensen, 151 Or 529, 51 P2d 835 (1935).

In State v. Johnson, 232 Or 118, 374 P2d 481 (1962) the defendant was arrested initially for violation of a city ordinance prohibiting registration under a false name. Evidence seized during the arrest led to a subsequent burglary conviction. However, the question of unfair police practice was not clearly presented for the defendant admitted the police entered his room lawfully and the seized evidence was in plain view.

crime in the travelling bag. Defendant was then apprised of his constitutional rights and following a relatively brief interrogation he confessed. The principle announced in *Escobedo v. Illinois,* 378 US 478, 84 S Ct 1758, 12 LEd2d 977 (1964), as interpreted by us in *State v. Neely,* 239 Or 487, 395 P2d 557, 398 P2d 482 (1965), is applicable not only to interrogations leading up to confessions but is equally applicable to interrogation aimed at obtaining the defendant's consent to search and seizure when he is a focal suspect in the custody of the police.[4] In effect, the request to search is a request that defendant be a witness against himself which he is privileged to refuse under the Fifth Amendment. *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 LEd2d 694, 10 ALR3d 974 (1966), made it clear that pre-interrogation warning by the police was necessary to safeguard this Fifth Amendment privilege. In this respect *Miranda* did not add anything to *Escobedo* or *Neely* because the protection of the Fifth Amendment was implicitly the rationale of these earlier holdings. There is, therefore, no problem of the retroactive application of *Miranda.* The Fifth Amendment privilege is recognized in these cases because its application was deemed necessary as a prophylaxis against coercive police practices. The same prophylaxis is necessary whether the interrogation is used to obtain a confession or to establish a suspect's guilt through his disclosure of evidence

---

[4] If there is probable cause justifying a basis for the issuance of a search warrant, it is arguable that the prophylaxis against coercive police practices which underlies the *Escobedo-Miranda* doctrine is not necessary because the police, having the means of obtaining the evidence through the use of search warrant, would not be impelled to use coercive practices in interrogating the accused for the purpose of obtaining his consent to the search. It is not necessary to decide whether interrogation under such circumstances falls within the *Escobedo-Miranda* doctrine.

pointing to his guilt.[9] In the present case defendant was clearly a focal suspect and he was in the custody of the police. This is the very type of situation in which the prophylactic rule in *Miranda* was intended to apply.

■ We hold, therefore, that the trial court erred in admitting the evidence produced by the search and seizure and in admitting the confession which, under the circumstances, cannot be disengaged from the previous illegal seizure.

The judgment is reversed and the cause is remanded for a new trial.

HOLMAN, J., dissenting.

The rules of *Escobedo* and *Miranda* were promulgated by the United States Supreme Court as prophylactic measures for the purpose of preventing police from exercising physical and psychological pressures upon persons in custody to obtain admissions and confessions. While this court had not theretofore seen sufficient evidence of such abuses in this state to merit such prophylactic rules, this court was bound by the necessarily uniform application of the Supreme Court's interpretation of the Fifth Amendment to the United States Constitution.

The majority of this court now apply *Escobedo* and *Miranda* rules to searches and seizures. The application of such rules to searches and seizures can only be justified on the basis that there is the same necessity for prophylaxis because of similar abuses by the police in obtaining consents to searches and seizures.

---

[9] It is arguable that *Miranda* is based upon "a more fundamental and far-reaching premise." See Note, Consent Searches: A Reappraisal After Miranda v. Arizona, 67 Colum L Rev 130, 139 (1967).

The United States Supreme Court has not yet determined that there are such abuses on a national scale and I know of no evidence which presently justifies such a determination in Oregon.

I, therefore, dissent.

PERRY, C. J. and GOODWIN, J. join in this dissent.