United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 16, 2007**

Charles R. Fulbruge III
Clerk

REVISED August 13, 2007

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-41369

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

RAUL JAVIER STEVENS; ALEJANDRO STEVENS

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Texas, Brownsville

Before KING, GARZA, and PRADO, Circuit Judges.

KING, Circuit Judge:

Defendants-appellants Alejandro Stevens and Raul Stevens challenge their convictions and sentences resulting from the discovery by law enforcement agents of approximately 300 pounds of marijuana in the backyard shed of the house in which they resided. Because Alejandro Stevens pleaded guilty and failed to preserve the right to appeal the district court's pretrial denial of his motion to suppress, we AFFIRM his conviction and sentence. We also AFFIRM Raul Stevens's conviction and sentence, concluding that the district court correctly denied Raul Stevens's motion to suppress, that Raul Stevens may not raise an ineffective

assistance of counsel claim on direct appeal, and that the district court did not commit <u>Booker</u> error in imposing his sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the course of investigating narcotics smuggling activity in Brownsville, Texas, Special Agent Robert Mossman of the U.S. Immigration and Customs Enforcement ("ICE") became aware of a plan to transport approximately 300 pounds of marijuana out of Brownsville. A confidential informant working with ICE agents had two meetings with a woman named Johanna Espinosa in which Espinosa and the informant made arrangements for the informant to transport the marijuana. ICE agents observed the meetings and listened to the conversations at the meetings through a wire worn by the informant. The first meeting, during which Espinosa phoned "George" and then "Raul" for information, revealed that the informant would be driving the marijuana to Georgia and that he would be paid $10,000 for the job.

A second meeting occurred the next day when the informant met Espinosa and another man, George, to finalize the arrangements for transporting the marijuana. The informant brought empty produce boxes in which to pack the marijuana for transport. After meeting with Espinosa, George and the informant left the second meeting together in the informant's car, with George driving. As George drove the car, he engaged in erratic

-2-

driving, or "heat runs," where he made quick U-turns and pulled into driveways and parking lots to see if he was being followed. After about forty minutes of heat runs, George and the informant met two men in a Ford Expedition in a supermarket parking lot. The identity of the driver of the Expedition was unknown; he was later identified as defendant-appellant Alejandro Stevens. Alejandro Stevens assisted George and the informant in transferring the produce boxes from the informant's car to the Expedition.  The boxes were to be taken to the marijuana stash house to be loaded with the marijuana.

After loading the boxes into the Expedition, George and the informant returned to the original meeting location with Espinosa, again engaging in heat runs along the way.  Espinosa confirmed that the boxes were being taken to the stash house for loading, and she told the informant that she would call him when the boxes were loaded.  Meanwhile, ICE agents followed the Expedition, which eventually arrived at 2994 Dana (the "Dana house") in Brownsville, Texas, after engaging in heat runs. Agents believed that the marijuana was located at the Dana house and would be loaded into the empty produce boxes.  A surveillance team directed by Agent Mossman watched the Dana house from several locations, including the side of the house, an alley behind the house, and a school across the street.  That night, the surveillance team observed people going back and forth from the house to a shed in the backyard.  Agent Mossman terminated

the surveillance at 9:30 p.m. that night.

Agent Mossman's team of agents planned to attempt to gain consent to search the home the following morning at 9:00 a.m. Surveillance agents arrived at the house around 8:00 a.m. and notified the "consent team" before 9:00 a.m. that three people had left the house in the Expedition. The surveillance team did not know at the time who was in the car, but they later learned that the driver was defendant-appellant Raul Stevens and that the two passengers were Raul Stevens's daughter and defendant-appellant Alejandro Stevens, his adult son. Raul Stevens dropped off his daughter at a local college. While the surveillance team followed the Expedition, the consent team, including Agent Mossman, arrived at the house to attempt to gain consent. Agents believed that there was someone in the house because there was a car in the driveway. However, no one answered the door.

Agent Mossman, still at the house, remained in radio and phone contact with the surveillance team following the Expedition. He ran the Expedition's registration and learned that it was registered to Raul Stevens at the Dana house address. The surveillance team told Agent Mossman that the Expedition was on 12th Street in Brownsville driving toward the bridge to Mexico. Concerned that the car was driving into Mexico, Agent Mossman instructed the surveillance agents to make a traffic stop and to ask Raul Stevens if he would consent to a search of the Dana house and return to the Dana house to undertake the search.

-4-

The Expedition was being followed by Agent Gentry driving one unmarked car and Deputy Silva driving another unmarked car. Deputy Martinez accompanied Deputy Silva. As the two officials followed the Expedition in their cars, they attempted to avoid detection by alternating the lead car position and by alternatively turning off the route taken by the Expedition. Agent Gentry informed Deputy Silva that he saw the Expedition make an illegal lane change while Deputy Silva was driving on another street. However, it was Deputy Silva and Deputy Martinez who executed the traffic stop of the Expedition. They did so by turning on the car's siren, pulling along side of the Expedition, showing Deputy Martinez's sheriff's badge to the driver, and asking him to pull over.

Deputy Silva approached the car and asked the driver, Raul Stevens, for his driver's license and proof of insurance. Agent Gentry pulled up behind the Expedition as Deputy Silva asked for these items. Without informing him of the traffic violation, Deputy Silva then informed Raul Stevens that a customs agent, Agent Gentry, wanted to speak to him. Agent Gentry approached Raul Stevens and informed him that they were conducting a narcotics investigation, that there were agents at the Dana house, and that they thought that there were "things . . . going on at his house." According to Agent Gentry, he asked for consent to search the house, and Raul Stevens consented to the search. Agent Gentry then asked Raul Stevens if he would

-5-

accompany him back to the house, and Raul Stevens agreed to do so. Raul Stevens accompanied Agent Gentry to Gentry's vehicle and got in the front seat. On their way to the house, Agent Gentry explained to Raul Stevens that agents believed that there were narcotics in the house. He asked him if his son, Alejandro Stevens, was involved in narcotics, and Raul Stevens replied that he didn't know.

When Raul Stevens arrived at the house with Agent Gentry, Agent Mossman was at the house with an additional six officers. Agent Mossman told Raul Stevens about what the agents had seen during the surveillance of the house and asked for his consent to search the house. At the suppression hearing, Raul Stevens denied giving consent, but Agent Mossman and Agent Gentry testified that Raul Stevens verbally consented to the search. They also testified that when they asked him to sign a consent form, he again said that they could search the house but that he would not sign anything. The door to the house was locked, but Raul Stevens produced the keys to the house and unlocked and opened the door.

Agent Mossman and Raul Stevens then entered the house. Raul Stevens cooperated in the search, directing Agent Mossman to his office, where agents found an AK-47, a small machine pistol, a shotgun, three handguns, thousands of rounds of ammunition, bullet-proof vests, and laser sights for assisting a shooter in focusing on a target. Agents also found a pound of marijuana in

the office with the guns and six grams of cocaine in Raul Stevens's bedroom.

While still inside the house, Agent Mossman asked Raul Stevens if he could also search the shed in the backyard behind the house. The door from the house to the backyard was locked, but Raul Stevens produced the key and unlocked the door so they could enter the yard. Agent Mossman observed two locked doors on the shed. Raul Stevens informed Agent Mossman that both locked doors led to the same area within the shed. Raul Stevens then produced the key to the locked shed door and unlocked it. After searching the room in the shed and finding no drugs, canine inspectors determined that a piece of plywood was sealing another door inside the shed and confirmed that the second external door provided entry into this room. The agents removed the plywood, opened the door, and found approximately 306 pounds of marijuana.

Alejandro Stevens remained at the scene of the traffic stop with Deputy Silva and Deputy Martinez when Raul Stevens left with Agent Gentry. According to Deputy Silva, Alejandro Stevens asked if he could leave the traffic stop, and Deputy Silva said "no." While Alejandro Stevens waited, he spoke on his cell phone. He then asked Deputy Silva if he could wait inside the Expedition. Deputy Silva said "yes," and Deputy Silva and Deputy Martinez waited in the Expedition with him. After agents at the house found the drugs, Agent Mossman told Deputy Silva and Deputy Martinez to bring Alejandro Stevens to the house.

Both Raul Stevens and Alejandro Stevens were placed under arrest and handcuffed at the house.  They were not given Miranda warnings at this time.  Agents placed them in the living room, where Raul Stevens sat on a couch about ten feet from Alejandro Stevens, who sat in a chair.  Agent Mossman testified that he told them, "[I]f you guys want to talk to me, you know where I am."  Agent Mossman waited outside.  Another agent came outside and told Agent Mossman that Alejandro Stevens wanted to talk to him.  Agent Mossman went inside and asked Alejandro Stevens what he wanted to talk about.  Alejandro Stevens said that he could tell him where there were stash houses containing thousands of pounds of marijuana if Agent Mossman would help him.  Agent Mossman asked him where the stash house was, and Alejandro Stevens told him it was in Mexico.  Agent Mossman testified that Raul Stevens then told him that the cocaine in the bedroom belonged to him.  According to Agent Mossman, Raul Stevens made this statement voluntarily and not in response to any questioning.

After the search of the house was completed, agents took Raul Stevens and Alejandro Stevens to the ICE office, where Agent Mossman testified that they were given their Miranda warnings. After their warnings were read, Alejandro Stevens repeated the same information that he told Agent Mossman at the Dana house about the stash houses.  Raul Stevens again claimed ownership of the cocaine and everything in the house but disclaimed ownership

-8-

of the marijuana found in the shed.

The grand jury indicted Alejandro Stevens and Raul Stevens on three counts.  Count One charged each with conspiracy to possess with intent to distribute approximately 139 kilograms (306 pounds) gross weight of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B).  Count Two charged each with possession with intent to distribute the same in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2.  Count Three charged each with possession with intent to distribute a quantity exceeding 100 kilograms or more of marijuana within 1000 feet of a public elementary school in violation of 21 U.S.C. §§ 841(a)(1) and 860.

Alejandro Stevens filed a pretrial motion requesting the district court to suppress statements made and physical evidence seized at the Dana House.  Raul Stevens also filed a pretrial motion to suppress all evidence seized as the result of the search of the house and all statements he made after his arrest. After a hearing, the district court denied each defendant's motion to suppress.  Alejandro Stevens then pleaded guilty to Count Two in exchange for the government dismissing Counts One and Three.  This agreement was entered into at Alejandro Stevens's rearraignment hearing without a written plea agreement preserving his right to appeal the denial of his motion to suppress.  Raul Stevens proceeded to a jury trial and was convicted on all three counts.

The district court sentenced Alejandro Stevens to serve a term of 110 months in the custody of the Bureau of Prisons and five years' supervised release and ordered a $100 special assessment.  On the same day, the court sentenced Raul Stevens to serve a total of 274 months in the custody of the Bureau of Prisons followed by eight years of supervised release.  Raul Stevens's Presentence Report ("PSR") reflected a base offense level of 28, for which the corresponding sentence range is 87 to 108 months' imprisonment.  The PSR recommended enhancements resulting in a total offense level of 35, for which the corresponding sentencing range is 210 to 262 months' imprisonment.  The government moved for an upward departure, and the district court did so on the basis of the large cache of loaded weapons in the house as well as the proximity of those weapons to an elementary school and crosswalk.  The court additionally ordered Raul Stevens to pay a $14,000 fine and a $300 special assessment.

Alejandro Stevens now appeals the district court's denial of his motion to suppress.  Raul Stevens likewise appeals the district court's denial of his motion to suppress.  Raul Stevens additionally claims ineffective assistance of counsel and challenges his sentence on the basis of Booker error.

## II. SUPPRESSION ISSUES

### A.  Standard of Review

In an appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and the district court's ultimate conclusion as to the constitutionality of the law enforcement action <u>de novo</u>. <u>United States v. Chavez-Villarreal</u>, 3 F.3d 124, 126 (5th Cir. 1993). If a particular suppression argument is not made to the district court, however, our review is for plain error. <u>United States v. De Jesus-Batres</u>, 410 F.3d 154, 158 (5th Cir. 2005). We view the evidence introduced at the suppression hearing in the light most favorable to the prevailing party, which in this case is the government. <u>United States v. Santiago</u>, 310 F.3d 336, 340 (5th Cir. 2002).

## B. Alejandro Stevens's Motion to Suppress

Alejandro Stevens argues that the district court erred when it denied his motion to suppress because law enforcement officials obtained physical evidence from the Dana House and statements from him in violation of his Fourth and Fifth Amendment rights. The government responds that Alejandro Stevens entered into an unconditional guilty plea and therefore waived his right to appeal the district court's denial of his motion to suppress.

When a defendant enters a voluntary and unconditional guilty plea, the plea has the effect of waiving all nonjurisdictional defects in the prior proceedings. <u>United States v. Wise</u>, 179

F.3d 184, 186 (5th Cir. 1999); <u>United States v. Bell</u>, 966 F.2d 914, 915 (5th Cir. 1992).  That waiver includes any further objection to evidence admitted pursuant to a district court's denial of a motion to suppress.  <u>Wise</u>, 179 F.3d at 186.  A defendant may enter a conditional guilty plea, however, and preserve the right to appeal a district court's adverse ruling on a pretrial motion.  <u>See</u> FED. R. CRIM. P. 11(a)(2).  Rule 11 provides that a conditional plea must be made in writing and consented to by the prosecution and the district court.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Wise</u>, 179 F.3d at 186.  Rule 11(a)(2)'s requirements of government consent and court approval reflect that a defendant has no absolute right to plead conditionally.  <u>Wise</u>, 179 F.3d at 187.  "The government and the court are free to reject a conditional plea for any reason or no reason at all."  <u>Bell</u>, 966 F.2d at 916.

Rule 11(h) allows for variance from Rule 11(a)(2)'s technical conditional plea requirements when the variance "does not affect substantial rights."  FED. R. CRIM. P. 11(h).  We have excused harmless variances under Rule 11(h) where "the record clearly indicates that the defendant intended to enter a conditional guilty plea, that the defendant expressed the intention to appeal a particular pretrial ruling, and that neither the government nor the district court opposed such a plea."  <u>United States v. Santiago</u>, 410 F.3d 193, 197 (5th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 1565 (2006); <u>accord</u> <u>Wise</u>, 179

-12-

F.3d at 187 (allowing variance from Rule 11(a)(2) when "the spirit of [Rule 11(a)(2) is] fulfilled by a clear indication on the record of the defendant's intention to appeal particular pretrial rulings, and the acquiescence of both the prosecution and the court"). For example, in Santiago we excused a defendant's variance from Rule 11(a)(2)'s technical requirements and permitted an appeal where the record showed that the district judge acknowledged the defendant's reservation several times, the government withdrew its initial objections to the defendant's reservation, the government submitted a factual basis sheet with handwritten revisions stating that the defendant preserved his right to appeal, and the district judge stated at the rearraignment hearing that the defendant did not have to refer to the factual basis sheet in order to preserve his right to appeal. Santiago, 410 F.3d at 197-98. By contrast, in Wise we concluded that a defendant did not fulfill the "spirit" of Rule 11(a)(2) where the defendant's written plea agreement contained no reservation of any kind, at the plea hearing the district judge orally reviewed the terms of the unconditional plea agreement, and both the defendant and his lawyer confirmed that there was no other agreement between the defendant and the government. Wise, 179 F.3d at 187.

Alejandro Stevens concedes that when he pleaded guilty to Count Two in exchange for the government's dismissing Counts One and Three, he did not explicitly preserve his right to appeal the

district court's denial of his motion to suppress in a written plea agreement in conformance with Rule 11(a)(2).  He argues, however, that the record shows that he has fulfilled the "spirit" of Rule 11(a)(2) according to our decisions in <u>Santiago</u> and <u>Wise</u>. Alejandro Stevens points to two statements in the record as proof of his intention to enter into a conditional plea.  First, in response to questioning from the district judge about the genesis of the plea agreement at the rearraignment hearing, the government's counsel stated that he "presumed" that Alejandro Stevens's attorney had approached the government about a plea to preserve Alejandro Stevens's right to appeal the ruling on his motion to suppress.  Second, Alejandro Stevens's PSR incorporated his post-plea written statement that he "accept[ed] responsibility for possession of marihuana seized . . . subject to his motion to suppress."  Alejandro Stevens urges that these statements show that he and the government had a common understanding that he would appeal and his attorney simply "misspoke" when he later stated that there was no limitation on the waiver of appeal.

These two statements, when viewed in light of the rearraignment and sentencing hearings in their entirety, are insufficient to establish that Alejandro Stevens reached any agreement with the government to enter a conditional plea.  To the contrary, the record unambiguously shows that Alejandro Stevens and his attorney denied that there was a conditional

-14-

plea. Moreover, the record clearly shows that the government and the district court never consented to a conditional plea.

At Alejandro Stevens's rearraignment hearing, there was a misunderstanding among government attorneys as to whether Alejandro Stevens would plead to Count Two or Count Three. In an effort to resolve the misunderstanding and proceed with the hearing, the district judge questioned the government as to how the plea had evolved, and the government recounted its "presumption" as to why Alejandro Stevens had approached the government to arrange a plea. The district judge recessed the hearing after her questioning failed to resolve the misunderstanding. When the hearing resumed, the district judge orally reviewed Alejandro Stevens's plea agreement and specifically asked Stevens, his attorney, and the government attorney about the scope of the plea agreement. All three individuals confirmed that the only agreement between the parties was that Counts One and Three would be dropped in exchange for the plea to Count Two.

These affirmations establish that despite the government's statement that it "presumed" that Alejandro Stevens approached it to discuss preserving his right to appeal, no such agreement materialized. Moreover, at Alejandro Stevens's later sentencing hearing, the district judge directly asked Alejandro Stevens's attorney and the government attorney whether there was a limitation on the waiver of appeal, and each attorney answered

-15-

"no."  Alejandro Stevens's unilateral post-plea statement in the PSR cannot overcome the unanimous disclaimer of any agreement between Stevens and the government beyond that to drop Counts One and Three in exchange for a plea to Count Two.  Because there is no indication in the record that the government or the district court consented to a conditional plea, we conclude that Alejandro Stevens's plea was unconditional.  Cf. Bell, 966 F.2d at 917 (concluding that there was no conditional plea where there was no written agreement to preserve an issue for appeal, no express acquiescence by the government, and no statement by the district judge approving a conditional plea); Wise, 179 F.3d at 187 (concluding that there was no conditional plea where district court orally confirmed that the written plea agreement which contained no reservation was the entire agreement between the parties).

Because Alejandro Stevens pleaded guilty and failed to preserve his right to appeal the district court's denial of his motion to suppress, we affirm his conviction and sentence.

## C.  Raul Stevens's Motion to Suppress

Raul Stevens contends that the district court erred in denying his motion to suppress evidence and statements.  First, he denies ever consenting to the search and contends that the search is illegal on that basis.  Second, he asserts that even if he did consent, his statement of consent was given pursuant to

police questioning while he was in custody but before his Miranda warnings were read to him.  He argues that because his Miranda warnings had not been read to him before he was asked for consent, his statement granting consent is inadmissible.  Third, he asserts in the alternative that any consent was given while he was illegally detained, and therefore his consent was not the product of his free will.

### 1.   Consent to Search

Raul Stevens first denies consenting to the search of the Dana house and urges that all physical evidence seized during the warrantless search is therefore inadmissible.  The issue of whether a defendant consented to a search is a question of fact to be determined by the totality of the circumstances.  United States v. Harrison, 918 F.2d 469, 473 (5th Cir. 1990).  Our review is thus for clear error.  Id.  "Where the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses."  United States v. Solis, 299 F.3d 420, 436 (5th Cir. 2002) (quoting United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993)).  A factual finding is clearly erroneous if, although there is evidence to support it, after viewing the record we are "left with the definite and firm conviction that a mistake has been committed."  United States v. U.S. Gypsum Co.,

-17-

333 U.S. 364, 395 (1948).

The district court found that Raul Stevens voluntarily consented to the search of his home while on the front porch of the Dana house. Raul Stevens denies that he gave agents consent to search his home. He does not challenge the voluntariness of his consent but rather disputes the fact of consent. Beyond his own denial of consent, the only evidence that he points to in support of his argument is the fact that he refused to sign a consent form authorizing the search of his home.

The district court did not clearly err in concluding that Raul Stevens granted consent to search his home. The district court credited the testimony of Agents Mossman and Agent Gentry. Agent Mossman testified at the suppression hearing that he requested consent from Raul Stevens while on the porch of the home and that Raul Stevens verbally agreed to the request. Agent Mossman further testified that he then asked Raul Stevens to sign a consent form, but Raul Stevens responded that he would not sign a form. Nevertheless, Raul Stevens repeated his verbal consent. According to Agent Mossman's testimony, Raul Stevens then used his house key and opened the locked front door of the house. After they entered the home together, Raul Stevens assisted officers in locating weapons in the office. They walked through the home to the back door, and Raul Stevens unlocked the back door so that officers could access the backyard. Finally, Agent

-18-

Mossman testified that Raul Stevens used his keys again to open the locked door of the backyard shed.

Agent Gentry, who drove Raul Stevens from the traffic stop to the Dana house, provided testimony consistent with that of Agent Mossman. Agent Gentry testified that he was on the front porch of the house when Agent Mossman requested consent and that Raul Stevens gave consent to the search. Agent Gentry also testified that after being asked to sign a consent form, Raul Stevens replied, "[Y]ou can search the house, but I'm not signing anything." Agent Gentry further testified that both the door to the home and the backyard shed were locked and that Raul Stevens produced the keys for each locked door and accompanied the agents as they entered the home.

Accordingly, the record shows that the district court did not clearly err in concluding that Raul Stevens consented to the search of his home.

**2. Admissibility of Statements Granting Consent to Search**

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), the Supreme Court held that in order to preserve the Fifth Amendment's privilege against self-incrimination, law enforcement officials must inform a suspect in custody of his right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to retain counsel or have counsel appointed for him. Statements obtained during a custodial

interrogation without the benefit of adequate warnings under Miranda are generally inadmissible.  Missouri v. Seibert, 542 U.S. 600, 608 (2004).  An individual is "in custody" for purposes of Miranda "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."  United States v. Bengivenga, 845 F.2d 593, 596 (5th Cir. 1988) (en banc).

Raul Stevens urges that his right to receive Miranda warnings was triggered at the traffic stop when he was questioned by Agent Gentry.  He argues that Deputy Silva detained him pursuant to a pretextual traffic stop and that he was taken into custody at the point that Deputy Silva "surrendered" him to Agent Gentry for questioning.  He further argues that any statement of consent made at the Dana house is inadmissible because it was given while he was in custody and pursuant to questioning by Agent Mossman, but without the benefit of Miranda warnings.  He contends that because the statement consenting to the search is inadmissible, the illegal drugs and weapons discovered during the subsequent search of his home and backyard shed are inadmissible as fruit of the poisonous tree.[1]  The government responds that

---

[1]    Raul Stevens's argument mentions in passing that he claimed ownership of the cocaine found in the bedroom before being given his Miranda rights.  However, he develops no argument for the exclusion of this statement, and in particular, advances

-20-

<u>Miranda</u> warnings were not applicable at the traffic stop because the traffic stop was legitimate and, under <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439-40 (1984), questioning a person at a routine traffic stop is not "custodial interrogation" triggering the right to <u>Miranda</u> warnings.  The government further argues that Raul Stevens consented to the search before he left the traffic stop and was not "in custody" when he arrived at the Dana house because he voluntarily left the traffic stop with Agent Gentry.

Because Raul Stevens raises his <u>Miranda</u>-based argument for the suppression of his statement of consent for the first time on appeal, we review for plain error.  Under the plain error standard of review, we make three initial determinations: (1) whether the district court committed error; (2) whether the error is "clear and obvious"; and (3) whether the error affects substantial rights.  <u>United States v. Avants</u>, 278 F.3d 510, 514 (5th Cir. 2002) (citing <u>United States v. Olano</u>, 507 U.S. 725, 732 (1993)).  If these three conditions are satisfied, we have discretion to reverse the district court if we conclude that the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  <u>Olano</u>, 507 U.S. at 732 (quoting <u>United States v. Young</u>, 470 U.S. 1, 15 (1985)); <u>see also</u>

---

no argument that the admission of the statement affected his substantial rights under the <u>Olano</u> framework.  Inadequately briefed issues are deemed abandoned.  <u>United States v. Charles</u>, 469 F.3d 402, 408 (5th Cir. 2006) (citing <u>Dardar v. Lafourche Realty Co.</u>, 985 F.2d 824, 831 (5th Cir. 1993)).

-21-

<u>Avants</u>, 278 F.3d at 514.

Assuming <u>arguendo</u> that Raul Stevens was "in custody" for <u>Miranda</u> purposes when he consented to the search, under the first prong of plain-error review, we consider whether the court erred by admitting evidence seized pursuant to that consent. We conclude that it did not.

The failure of officials to give <u>Miranda</u> warnings before asking for consent does not prohibit the use of a defendant's in-custody statements granting consent to a search. <u>See United States v. Garcia</u>, 496 F.2d 670, 675 (5th Cir. 1974); <u>see also United States v. Dancy</u>, 861 F.2d 77, 80 (5th Cir. 1988) (holding that <u>Miranda</u> warnings are not required to validate in-custody consent searches). A statement granting "consent to a search . . . is neither testimonial nor communicative in the Fifth Amendment sense." WAYNE R. LAFAVE, JEROLD H. ISRAEL, & NANCY J. KING, CRIMINAL PROCEDURE § 3.10 (4th ed. 2004). As we explained in <u>Garcia</u>, a statement of consent is properly scrutinized under the Fourth Amendment rather than the Fifth Amendment[2]:

> In a fifth amendment context a defendant's statements, in and of themselves, present the potential constitutional evil. For purposes of the fourth amendment . . . it is an unreasonable search that is to be condemned, not the use of the defendant's

_____

[2] Raul Stevens does not argue that his consent was not valid under a Fourth Amendment voluntariness standard. Rather, he narrowly argues that his statement of consent is inadmissible under the Fifth Amendment because he had not received his <u>Miranda</u> warnings.

-22-

> statements proving consent to a search. A search and seizure produces real and physical evidence, not self-incriminating evidence. Our task under the fourth amendment is to test the reasonableness of a search and exclude evidence procured unreasonably. . . . Therefore, _Miranda_'s ratio decidendi which was enunciated to strengthen the fifth amendment's function in preserving the integrity of our criminal trials should not be superimposed ipso facto to the wholly different considerations in fourth amendment analysis.

496 F.2d at 675. Other courts considering the question have similarly concluded that statements of consent are not testimonial within the meaning of the Fifth Amendment.[3]

Further, the instant case is unlike _United States v. Green_, 272 F.3d 748, 752 (5th Cir. 2001), where we held that asking an arrested defendant to disclose the location of firearms and open

---

[3] _See, e.g._, _United States v. McClellan_, 165 F.3d 535, 544 (7th Cir. 1999) ("[A] request for consent to search is not an interrogation within the meaning of _Miranda_ because the giving of such consent is not a self-incriminating statement.") (internal quotations omitted); _United States v. McCurdy_, 40 F.3d 1111, 1118 (10th Cir. 1994) ("An officer's request to search a defendant's automobile does not constitute interrogation invoking a defendant's _Miranda_ rights."); _People v. Thomas_, 12 Cal. App. 3d 1102, 1110-11 (Cal. Ct. App. 1970) ("The fact that the search leads to incriminating evidence does not make the consent testimonial."); _see also_ _United States v. Payne_, 119 F.3d 637, 643-44 (8th Cir. 1997) ("_Miranda_ rights affect the integrity of the truth finding process in a criminal trial, but Fourth Amendment rights go to the right of privacy and to be left alone. As the purposes of the two protections are different, it would be unreasonable to require _Miranda_ warnings before a request for permission to search. Instead, the fact that _Miranda_ warnings were not given will simply be a factor to consider under the voluntariness test." (internal citations omitted)); _but see_ _Oregon v. Williams_, 432 P.2d 679, 683 (Or. 1967) ("In effect, the request to search is a request that defendant be a witness against himself which he is privileged to refuse under the Fifth Amendment.").

cases containing those firearms after he had been given his Miranda warnings and had requested counsel was "custodial interrogation" resulting in testimonial acts inadmissible under the Miranda doctrine. In this case, there were no such testimonial acts, even where Raul Stevens produced the key to the Dana house and unlocked the door. The record shows that Raul Stevens gave verbal consent and unlocked the door to the house in response to Agent Mossman's request to search the house. This is unlike the request in Green to disclose the location of firearms, which was a question likely to elicit an incriminating response. Id.

Accordingly, we conclude that the district court did not err in admitting the evidence seized in the search of the Dana house pursuant to Raul Stevens's un-Mirandized statement of consent. Even if, arguendo, there was error, it was not "clear and obvious."

### 3. Consent Pursuant to an Illegal Detention

Finally, Raul Stevens asserts that even if he did consent to the search, his consent was not voluntary if it was given pursuant to an illegal detention. "Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation." Chavez-Villarreal, 3 F.3d at 127. Raul Stevens asserts in conclusory fashion that he was illegally detained and that there were no intervening circumstances between his illegal

-24-

detention and his statement of consent to remove the taint of the illegal detention. The reasonableness of a traffic stop is a conclusion of law, Harrison, 918 F.2d at 473, and because Raul Stevens raised the legitimacy of the traffic stop below, our review is de novo, Chavez-Villarreal, 3 F.3d at 126.

The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968). See United States v. Sharpe, 470 U.S. 675, 682 (1985) (applying Terry analysis to stop of vehicles suspected of transporting drugs); Harrison, 918 F.2d at 472 (applying Terry analysis to night-time stop of vehicle driving without lights after it was observed driving away from rural airstrip where airplane suspected of carrying illegal drugs had landed); United States v. Valadez, 267 F.3d 395, 397-98 (5th Cir. 2001) (applying Terry analysis to stop of vehicle for two suspected traffic violations). Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. Terry, 392 U.S. at 19-20; Valadez, 267 F.3d at 398.

Raul Stevens raises two arguments for why his detention was illegal. Raul Stevens first articulates that his detention was unlawful because the initial traffic stop based on the illegal

-25-

lane change was pretextual. But it is well established that "[s]o long as a traffic law infraction that would have _objectively_ justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1998) (emphasis added) (citing Whren v. United States, 517 U.S. 806 (1996)). The district court credited Agent Gentry's testimony and concluded that the traffic stop was objectively reasonable because Raul Stevens made an illegal lane change. The record supports this conclusion, and at oral argument Raul Stevens admitted that he did not dispute that he changed lanes illegally. Therefore, his first argument has no merit.

Second, at oral argument, Raul Stevens argued that his detention became unreasonable (and therefore illegal) under Terry's second prong because the basis for the traffic stop was the illegal lane change but the subsequent actions of the officers were not reasonably related to the illegal lane change justifying the stop. His argument, however, ignores the district court's conclusion that the stop was independently valid under Terry because officers were aware of sufficient articulable facts to form a reasonable suspicion that the Expedition was involved in criminal activity apart from the illegal lane change. Giving a pretextual traffic violation as the reason for a stop does not invalidate an otherwise justified stop. Cf. Harrison, 918 F.2d

-26-

at 472 (stopping vehicle for articulated reasons of driving above speed limit and without lights was not illegal where officer independently had reasonable suspicion that vehicle was trafficking drugs). Important to our decision is the fact that Raul Stevens does not argue under Terry's first prong that officers did not have reasonable suspicion to justify the stop based on their surveillance of the Dana house and the meetings between Espinosa, Alejandro Stevens, and the informant. Even more important is the fact that he does not argue under Terry's second prong that the subsequent actions of the officers exceeded the scope of this independent justification for stopping the vehicle. Inadequately briefed issues are deemed abandoned. Charles, 469 F.3d at 408 (citing Dardar, 985 F.2d at 831).

Concluding that none of Raul Stevens's arguments for suppression is availing, we affirm the district court's denial of his motion to suppress.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Raul Stevens claims, for the first time on appeal, that he was denied his Sixth Amendment right to effective assistance of counsel at trial when his attorney failed to raise the violation of his right to be given Miranda warnings during custodial interrogation. He also raises a number of other errors he contends his attorney made to support his argument that his attorney failed to achieve an objective standard of

reasonableness under the standard set forth by <u>Strickland v.</u> <u>Washington</u>, 466 U.S. 668, 669 (1984).

As a general rule, we do not review Sixth Amendment claims of ineffective assistance of counsel on direct appeal unless they were adequately raised in the trial court. <u>United States v.</u> <u>Gibson</u>, 55 F.3d 173, 179 (5th Cir. 1995). Because the trial court is the proper place to develop the record necessary for the resolution of ineffective assistance of counsel claims, only in "rare cases where the record allow[s] us to evaluate fairly the merits of the claim" will this court resolve ineffective assistance issues on direct appeal. <u>United States v. Palmer</u>, 122 F.3d 215, 221 (5th Cir. 1997).

Raul Stevens concedes he did not raise his ineffective assistance of counsel claim at trial. Nevertheless, he urges that this is one of those "rare cases" where the record allows us to evaluate the merits of his claim. We disagree. Where a claim of ineffective assistance of counsel has not been raised below, the exception to our general rule of non-review is typically satisfied only where the actual claim was raised and developed in a post-trial motion to the district court. <u>Compare</u> <u>Gibson</u>, 55 F.3d at 179 (granting an exception to the general rule of non-review on direct appeal because the defendant's post-trial motions in the district court raised allegations of trial counsel's deficiencies), <u>with</u> <u>United States v. Wallace</u>, 32 F.3d 921, 930 (5th Cir. 1994) (dismissing ineffective assistance of

-28-

counsel claim on direct appeal even where the claim was mentioned at trial because the record was not sufficiently developed), and United States v. Gonzalez, 436 F.3d 560, 581 (5th Cir. 2006) (dismissing ineffective assistance of counsel claim on direct appeal even where record showed counsel's failure to object because actual claim had not been raised and developed below). In this case, the record is not sufficiently developed with respect to Raul Stevens's ineffective assistance of counsel claim to justify an exception to our general rule of non-review. Accordingly, we deny relief on Raul Stevens's present ineffective assistance of counsel claim without prejudice to his right to pursue the claim in collateral review.

## IV. SENTENCING

The district court imposed enhancements to Raul Stevens's sentence for obstruction of justice, his role in the offense, and for committing the offense while on supervised release. Relying on United States v. Booker, 543 U.S. 220 (2005), Raul Stevens objected to these enhancements below and now re-urges that the district court violated the Sixth Amendment by enhancing his sentence based on facts not found by the jury beyond a reasonable doubt.

Booker error occurs when the sentencing judge bound by mandatory United States Sentencing Guidelines ("Guidelines") increases the defendant's sentencing range based on facts not

found by the jury or admitted by the defendant.  <u>United States v. Mares</u>, 402 F.3d 511, 518 (5th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 43 (2005).  But under <u>Booker</u>, "with the mandatory use of the Guidelines excised, . . . [t]he sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guideline[s] sentencing range."  <u>Id.</u> at 519.  Raul Stevens was sentenced under the post-<u>Booker</u> advisory Guidelines system, and the record indicates that the district judge was aware of the Guidelines' advisory nature.  There was therefore no <u>Booker</u> error in Raul Stevens's sentencing.

## V. CONCLUSION

For the foregoing reasons, Alejandro Stevens's and Raul Stevens's convictions and sentences are AFFIRMED.